UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIVIX GOLF, INC., Plaintiff, v. JEFFREY P. MOHR; et al., Defendants. | Civil No. 05CV1488 JAH (CAB) **CLAIM CONSTRUCTION ORDER AND ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** **[Doc. Nos. 18 and 56]** |

## INTRODUCTION

At issue is the construction of disputed terms used in U.S. Patent No. 6,162,137, and Defendants' Jeffrey P. Mohr, Remedy Golf, Inc., Bandwagon, Inc., Diana Sarcoz and Felix Hoang (collectively "Defendants") motion for partial summary judgment of patent invalidity. Doc. Nos. 18 and 56. Plaintiff Divix Golf, Inc. ("Plaintiff") and Defendants fully briefed the issues. Oral arguments were heard on September 26, 2006, with appearances by Thomas Tighe for Plaintiff, and John Haller and Steele Gillaspey for Defendants. This Court, after hearing the oral argument of counsel, took the matters under submission. After a thorough consideration of the pleadings, files and records in this case, including the patent-in-suit and the relevant prosecution history, as well as the oral argument of counsel, the Court now construes the disputed terms in the claims, and DENIES in its entirety Defendants' partial motion for summary judgment of patent invalidity.

///

///

## BACKGROUND

### I. Factual Background

U.S. Patent No. 6,162,137 ("the '137 Patent") was filed on May 24, 1999, by inventors Todd Jones and Greg Bark (collectively "Applicants"), and subsequently assigned to Plaintiff Divix Golf, Inc. *See* Cplt. at 2. The '137 Patent claims a combination ball mark repair tool, golf club support and cigar cutter.

On April 6, 2000, the Examiner rejected claims 1-14 in a first office action on the basis of indefiniteness under 35 U.S.C. § 112, anticipation under 35 U.S.C. § 102(b) and obviousness under 35 U.S.C. § 103(a). The Applicants amended the specification, as well as claims 2-4, 13 and 14 to overcome the Examiner's objections. Doc. No. 35, Exh. 2 at 17.

On July 26, 2000, the Examiner faxed a response to the Applicants, asserting that claim 1 was still anticipated in light of U.S. Patent No. 5,449,169 to Hardin et al. The Examiner further stated that "claim 1 would be allowable if the limitations of claim 5 were added to the claim (or at least the first half of claim 5 where the 'means for prying pivotable between the two operable positions.'). Doc. No. 35, Exh. 2 at 23. The Examiner added that the language of claim 1 should be changed from "either position" to "both positions" in order to make clear the invention of claim 1. On July 27, 2000, the Applicants submitted a "Draft Amendment" communication, setting forth amendments to claims 1 and 5, stating that "Claims 1 and 5 have been amended as suggested by the examiner and as such are ready for allowance." Id. at 37. The Examiner issued a "Notice of Allowance" on July 31, 2000. Id. at 43. The patent issued on December 19, 2000.

### II. Procedural Background

Plaintiff filed a complaint on July 26, 2005, alleging patent infringement of the '137 Patent, conversion and conspiracy to commit conversion, trademark and trade dress infringement, breach of fiduciary duty, misappropriation of trade secrets and common law and state unfair competition claims. Defendants Jeffrey P. Mohr, Remedy Golf, Inc., Diana Sarcoz and Felix Hoang filed an answer on August 17, 2005, and alleged counterclaims for patent invalidity, patent unenforceability, non-infringement of patent, non-infringement of trademark,

invalidity of trademark, invalidity of trade dress and unenforceability of trade secret. Doc. No. 3. Plaintiff filed an answer to the counterclaims on September 8, 2005. Doc. No. 6.

On October 11, 2005, Defendant Bandwagon, Inc. filed an answer and counterclaims for patent invalidity, patent unenforceability, non-infringement of patent, non-infringement of trademark, invalidity of trademark, invalidity of trade dress and unenforceability of trade secret. Doc. No. 8. Plaintiff filed an answer to Defendant Bandwagon, Inc.'s counterclaims on November 18, 2005. Doc. No. 12.

On May 3, 2006, Defendants filed a "joint hearing statement" pursuant to Magistrate Judge Cathy Ann Bencivengo's scheduling Order of January 6, 2006. Doc. No. 25. The filing, aside from the joint claim construction chart, did not include input from plaintiff as explicitly directed by Judge Bencivengo. This Court, after reviewing the joint hearing statement, issued an Order directing the parties to file a hearing statement that comported with the Court's scheduling Order of January 6, 2006. *See* Doc. No. 30. Defendants filed an amended joint claim construction chart on May 15, 2006. Doc. No. 29. The parties filed a joint hearing statement on May 22, 2006, and a second joint amended claim construction chart on June 2, 2006. *See* Doc. Nos. 32 and 37.

The parties filed their respective opening briefs on May 30, 2006. Doc. Nos. 34 and 35. On June 13, 2006, the parties filed their responsive briefs. Doc. Nos. 38 and 39. On June 30, 2006, this Court, after reviewing the parties' submitted briefs, directed the parties to submit supplemental briefing on the claim construction matter, and rescheduled the claim construction hearing.

On June 22, 2006, Defendants filed an ex parte application requesting leave to continue the scheduled Markman hearing, and file a motion for partial summary judgment on invalidity. Doc. No. 48. This Court granted Defendants' ex parte request, and rescheduled the Markman hearing to September 28, 2006. On July 10, 2006, the parties submitted a Third Amended Joint Claim Construction Chart to this Court. Doc. No. 49.

On August 17, 2006, Plaintiff filed its opening Markman brief. Doc. No. 54. Defendants filed a combined Markman hearing and motion for summary judgment brief on

August 22, 2006. Doc. No. 56. On August 22, 2006, the parties filed their Fourth Amended Joint Claim Construction chart. Doc. No. 60. Defendants filed their responsive Markman brief on August 31, 2006. Doc. No. 66. On September 5, 2006, Plaintiff filed an opposition to Defendants' combined Markman and motion for summary judgment brief. Doc. No. 67. On September 11, 2006, Defendants filed a reply to Plaintiff's opposition. Doc. No. 68.

On September 13, 2006, Defendants filed nunc pro tunc an objection and motion to strike to Plaintiff's opposition brief. Doc. No. 70. On September 15, 2006, Plaintiff filed an ex parte application for leave to file an opposition to Defendants' objections and motion to strike. On September 20, 2006, this Court denied Defendants' motion to strike and denied Plaintiff's ex parte application as moot. The Markman and partial motion for summary judgment hearings were held on September 28, 2006, after which the matter was taken under submission by this Court. Doc. No. 77.

## DISCUSSION

### I. Legal Standard

#### A. Claim Construction

"The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." Embrex, Inc. v. Serv. Eng'g Corp., 216 F.3d 1343, 1347 (Fed. Cir. 2000). Claim interpretation requires a review of the intrinsic evidence, including the claim language and written description contained within the body of the patent specification and the prosecution history. *See* Embrex, 216 F.3d at 1347. Extrinsic evidence, such as expert witnesses or dictionaries, may also be considered "if the court deems it helpful in determining the true meaning of the language used in the patent claims." Phillips v. AWH Corp., 415 F.3d 1303, 1318 (Fed. Cir. 2005). The Federal Circuit in Phillips cautions, however, that the court must "attach the appropriate weight . . . to [extrinsic] sources in light of the statutes and policies that inform patent law." Id. at 1324.

In determining the meaning of the asserted patent claims, the court considers "the evidence necessary to resolve disputes about claim terms and to assign a fixed, unambiguous,

legally operative meaning to the claim." Liquid Dynamics Corp. v. Vaughn Dynamics Co., Inc., 355 F.3d 1361, 1367 (Fed. Cir. 2004). The Federal Circuit repeatedly emphasizes that "the words of a claim 'are generally given their ordinary and customary meaning.'" Phillips, 415 F.3d at 1312, citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." Phillips, 415 F.3d at 1313. The person of ordinary skill in the art must view the claims "in the light of the entire intrinsic record." Nystrom v. Trex Co., Inc., 424 F.3d 1136, 1142 (Fed. Cir. 2005). The claims, therefore, are read "in view of the specification, of which they are a part." Id., citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Phillips, 415 F.3d at 1316.

While prosecution history may be relevant in the construction of claim terms, "there is a clear distinction between following the statements in the prosecution history in defining a claim term, and the doctrine of prosecution history estoppel, which limits expansion of the protection under the doctrine of equivalents when a claim has been distinguished over relevant prior art." Southwall Technologies, Inc. V. Cardinal IG Co., 54 F.3d 1570, 1578 (Fed. Cir. 1995).

**B. Means Plus Function Claims**

35 U.S.C. § 112, paragraph 6, allows a patentee to express claim elements in terms of their function without the recital of structure or material within the claim. Such "means-plus-function" claims are construed to cover the corresponding structure or materials contained within the body of the specification. Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1298 (Fed. Cir. 2005). The requirement of a corresponding structure in the specification is the quid pro quo for patentees in exchange for the convenience of using this simplified claim language. Id. "Fulfillment of the § 112, ¶ 6 trade-off cannot be satisfied when there is a total omission of structure." Atmel Corp. v. Information Storage Devices, 198 F.3d 1374, 1382 (Fed. Cir. 1999). However, the specification need not include

"all things necessary to enable the claimed invention," only "all structure that actually performs the recited function." Default Proof, 412 F.3d at 1298, citing to Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106, 1109 (Fed. Cir. 2002). Thus, the construction of a means-plus-function claim requires two steps: 1) determine the claimed function; and 2) "identify the corresponding structure in the written description that performs that function." JVW Enterprises, Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2004).

Federal Circuit precedent dictates that the use of the term "means" creates "a rebuttable presumption that § 112 ¶ 6 applies." CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1369 (Fed. Cir. 2002). Likewise, the absence of the term "means" will "trigger a rebuttable presumption that § 112 ¶ 6 does not apply." Id. "The use of the term 'means' is 'central to this analysis,' because the term 'means,' particularly as used in the phrase 'means for,' is part of the classic template for functional claim elements.'" Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1358 (Fed. Cir. 2004) (citations omitted). Whether claim language should be interpreted as a "means-plus-function" limitation is a matter of law. Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1318 (Fed. Cir. 2004).

**C. Doctrine of Claim Differentiation**

The doctrine of claim differentiation "create[s] a presumption that each claim in a patent has a different scope." Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998). "The difference in meaning and scope between claims is presumed to be significant '[t]o the extent that the absence of such difference in meaning and scope would make a claim superfluous.'" Free Motion Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1351 (Fed. Cir. 2005), quoting Tandon Corp. v. United States Int'l Trade Comm'n, 831 F.2d, 1017, 1023 (Fed. Cir. 1987); *see also* Phillips, 415 F.3d at 1315.

The doctrine is strongest "where the limitation sought to be 'read into' an independent claim already appears in a dependent claim." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004). However, it is not an absolute doctrine. "[T]he doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence . . . . Claims that

are written in different words may ultimately cover substantially the same subject matter." Multiform Dessicants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1480 (Fed. Cir. 1998).

### D. Use of Extrinsic Evidence in Claim Construction

The use of extrinsic evidence in claim construction is viewed generally as "less reliable" than intrinsic evidence. *See* Phillips, 415 F.3d at 1318. The court listed five separate reasons why extrinsic evidence should be viewed with skepticism during claim construction analysis: 1) it is not part of the patent, and was not created for the sole purpose of "explaining the patent's scope and meaning"; 2) extrinsic publications, versus the patent specification, are not necessarily created for the person of ordinary skill in the art, and therefore "may not reflect the understanding of a skilled artisan in the field of the patent"; 3) expert reports and testimony are created solely for a litigation purpose and may suffer from bias; 4) the existence of an "unbounded universe of potential extrinsic evidence" that a litigant will pick and choose from to present evidence that favor its opinions; and 5) risk from use of extrinsic evidence to "change the meaning of claims" as set forth in the patent specification, which would undermine the public notice function of patents. Id. at 1318-1319. The court concluded that although extrinsic evidence may be helpful, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of intrinsic evidence." Id. at 1319.

In this context, the Federal Circuit in Phillips noted that a district court may use extrinsic evidence "in its sound discretion" to "help educate the court regarding the field of the invention, and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean," but admonished the district court to "keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly." 415 F.3d at 1319. The Federal Circuit continually reminds district courts of this principle, requiring any use of extrinsic evidence to be viewed in the context of the patent specification and claim terms themselves. *See* Atofina v. Great Lakes Chemical Corp., 441 F.3d 991, 996 (Fed. Cir. 2006) ("[T]he court must ensure that any reliance on dictionaries accords with the intrinsic evidence"), citing Free Motion, 423 F.3d at 1348-49; In re Johnston, 435 F.3d 1381 (Fed. Cir. 2006) ("It is well established that dictionary definitions must give way o the meaning imparted

by the specification"); Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc., 429 F.3d 1364, 1375 (Fed. Cir. 2005) ("[J]udges may 'rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'"), quoting Phillips, 415 F.3d at 1322-23.

**E. Patent Invalidity - Indefiniteness**

35 U.S.C. § 112, ¶ 2, provides: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. The requirement to "distinctly" claim means that the correctly construed claim must have a meaning discernible to one of ordinary skill in the art. Union Pac. Res. Co. v. Chesapeake Energy Corp., 236 F.3d 684, 692 (Fed. Cir. 2001). "Only when a claim remains insolubly ambiguous without a discernible meaning after all reasonable attempts at construction must a court declare it indefinite." Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings, 370 F.3d 1354, 1366 (Fed. Cir. 2004) (citing Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001)).

**F. Patent Invalidity - Enablement**

35 U.S.C. § 112, ¶ 1, provides: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains or with which it is most nearly connected, to make and use the same. . . ." 35 U.S.C. § 112, ¶ 1. Enablement requires that "the prior art reference must teach one of ordinary skill in the art to make or carry out the claimed invention without undue experimentation." Minnesota Mining and Manufacturing Co. v. Chemque, Inc., 303 F.3d 1294, 1301 (Fed. Cir. 2002). "The enablement requirement is met if the description enables any mode of making and using the claimed invention." Engel Indus., Inc. v. Lockformer Co., 946 F.2d 1528, 1533 (Fed. Cir. 1991).

///

///

///

///

## II. Analysis

### A. Claim Construction

Claims 1-14 are at issue in this action, of which only claim 1 is an independent claim.

#### 1. Claim 1[1]

Claim 1 recites:

A device for repairing a ball mark in turf comprising:
a) a handle,
b) means, connected to the handle, for prying up a ball mark in turf, the means for prying being pivotable between two operable positions, a first position at which said means is retracted into the handle and a second position at which the handle can [sic] used for leverage to pry up the turf, and
c) means for releasably locking the means for prying at both positions.

##### a. *Means . . . for Prying Up*

The parties agree that this disputed term falls within 35 U.S.C. § 112, ¶ 6 "means-plus-function" claim. In order to properly construe this claim, this Court must: 1) first determine the function claimed by the disputed phrase, and 2) "identify the corresponding structure in the written description of the patent that performs that function." Applied Medical Resources Corp. v. Surgical Corp., 448 F.3d 1324, 1332 (Fed. Cir. 2006).

The parties initially agree that the function related to the "means ... for prying up" is to "pry up a ball mark." *See* Doc. No. 60 at 1. However, the parties disagree as to the structure in the patent specification related to this function. Plaintiff identifies the corresponding structure as "pair of tines 10A and 10B and shank 4" of Fig. 1, and as described in the '137 Patent specification at column 1, lines 24-26. Doc. No. 54 at 3. Defendants contend that the structure consists of "a shank and one or more tines, a blade, or a shovel-like head." Doc. No. 56 at 7, citing to '137 Patent at 2:42-45; 4:64-68. Defendants also contend that the means for prying must include "one or more tines" pursuant to the doctrine of claim differentiation. Id. Defendants assert that because claim 9 recites "a shank and a plurality of tines projecting therefrom," the doctrine of claim differentiation requires claim 1 to be more general and contain "one or more tines" because claim 9 already requires "more than one tine." Id. at 7-8.

The patent specification identifies several corresponding structures regarding the "means

---

[1] The disputed terms in each claim are underlined below.

for prying up." First, the specification describes the prier (means for prying up a ball mark) as consisting of "a shank 4 pivotally connected to a handle 6, and a pair of tines, 10A and 10B, integral with the shank and extending therefrom at an end opposite the handle." '137 Patent at 3:24-27. The specification also speaks to alternative structures:

> Although the shank can terminate in a shape other than tines (e.g. a blade or a shovel-like head), the tines are preferable for prying up depressed turf without significantly damaging it.

'137 Patent at 4:64-67. Accordingly, the structures in the '137 Patent specification that encompass the "means ... for prying up" include: a shank terminating in a pair of tines, blade or a shovel-like head.

Defendants' argument that claim 1 must be construed as containing "one or more tines" is not persuasive in light of the claim language and specification. The specification does not refer to the means for prying up structure as a singular "tine", but rather only refers to this structure in plural form, or as "tines." *See* '137 Patent at abstract, 2:12, 2:42, 3:26, 4:60, 4:62-63, 4:66 and 6:12. In addition, Defendants' argument that the doctrine of claim differentiation requires the means for prying up to contain at least one tine lacks merit in light of the alternative structures present in the specification that could take the place of the two tines terminating from the shank. Thus, because the shank could also terminate in a blade or a shovel-like head in claim 1, claim 9 is differentiated from claim 1 because claim 9 narrows the "means for prying up" to "a shank and a plurality of tines projecting therefrom."

Accordingly, for the reasons stated above, the Court construes the term "means ... for prying up" as a means plus function claim under 36 U.S.C. § 112, ¶ 6, where the function is:

***to pry up a ball mark in turf***,

and the corresponding structure in the specification is:

***a shank terminating in a pair of tines, a blade or a shovel-like head***.

*b. <u>Two Operable Positions</u>*

Plaintiff contends that the disputed phrase "two operable positions" means that the "means for prying" can be rotated into one of two positions: 1) open where the means for prying extends out; or 2) in a retracted position where the "means for prying" is in the handle

of the device. Doc. No. 54 at 4. Defendants, relying on a dictionary definition, argue that the disputed phrase means "two points for use." Doc. No. 57 at 8, citing to Merriam Webster's on-line dictionary.[2] Although Defendants agree that the term "pivotable" means that the prier can be "pivoted, i.e. rotated, about its connection to the handle to be in either of two positions", *see* Doc. No. 60 at 2, Defendants contend that Plaintiff's construction impermissibly limits the definition to the preferred embodiment of the specification. Id. Defendants, in their construction of this phrase, instead rely on a dictionary definition of operable, where such a device would be "fit, possible, or desirable to use: practicable." Doc. No. 57 at 8.

Although extrinsic evidence "'can shed useful light on the relevant art,'" the Phillips court recognized that undue reliance on extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope." 415 F.3d at 1317, 1319. The Phillips court cites several reasons for the unreliability of extrinsic evidence, including that: 1) definitions arising from extrinsic evidence is not created at the same instance as the patent specification; 2) extrinsic writings are not likely created by a skilled artisan in the relevant field; 3) testimony created for litigation purposes may suffer from bias; 4) marginal relevance because of an "unbounded universe" of extrinsic evidence, allowing litigants to choose only favorable definitions; and 5) undermining of the "public notice function of patents" if undue reliance is made exclusively on extrinsic evidence. Id. at 1318-19.

In its opinion, the Phillips court singled out general purpose dictionaries in contributing to the inherent overbreadth and unreliable interpretation that may come when undue reliance is placed on extrinsic evidence:

> Dictionaries, by their nature, provide an expansive array of definitions. General dictionaries, in particular, strive to collect all uses of particular words, from the common to the obscure. By design, general dictionaries collect the definitions of a term as used not only in a particular art field, but in many different settings. In such circumstances, it is inevitable that the multiple dictionary definitions for a term will extend beyond the "construction of the patent [that] is confirmed by the avowed understanding of the patentee, expressed by him, or on his behalf, when his application for the original patent was pending."

---

[2] Defendants cite to the "general purpose dictionary www.marriamwebster.com ("Webster's)" as support for their claim construction. Doc. No. 56 at 2. A search on the internet did not result in an on-line general purpose dictionary website. Defendants presumably are referring to the on-line website for the general purpose dictionary, Merriam Webster, which is located at www.merriamwebster.com.

Id. at 1321-22, quoting Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227 (1880). The court concluded "[f]or that reason, we have stated that 'a general usage dictionary cannot overcome art-specific evidence of the meaning' of a claim term." Id. at 1322, quoting Vanderlande Indus. Nederland BV v. I.T.C., 366 F.3d 1311, 1321 (Fed. Cir. 2004). A reviewing court, accordingly, must keep vigilant the appropriate weight assigned to both intrinsic and extrinsic evidence, in particular general purpose dictionaries, in order to capture how an artisan skilled in the relevant field would understand the claim terms. Id. at 1324.

Here, Defendants place full weight on a general purpose dictionary definition and fail to discuss whether the dictionary definition comports with the intrinsic evidence, or the specification and claims, in contravention to the findings in Phillips and subsequent Federal Circuit precedent. For example, although Defendants rely on a general purpose dictionary for the definition "two points for use," the specification speaks to the device operating in two specific positions: the "first position at which the prier is retracted, i.e. folded into the handle, and a second position at which the handle can be used to leverage the prier to pry up the turf." '137 Patent at 2:36-40 and claim 1. In addition, the patent specification explicitly states as a feature that the invention provides "a small collapsible tool for repairing ball marks." '137 Patent at 2:3-4. Thus, Defendants fail to discuss the dictionary definition of the disputed claim terms with respect to the two positions noted in the specification, as well as the term "operable" in regards to the two "operating" positions disclosed in the specification.

Even if the Court takes Defendants dictionary definition as true, the two positions noted in the specification would fall within Defendants' definition of operable. Thus, both the extended and retracted positions are "operable", i.e. fit, desirable to use or practicable. The extended position is operable because it provides the means for prying up the turf beneath a ball mark. The retracted position is also operable because it allows the tool to be collapsible, and thus "practicable" to carry for a golfer. *See* '137 Patent at 1:14-16.

Finally, Defendants' argument also lacks merit in light of the rest of the claim language. The language in claim 1 goes on to define the two operable positions as "a first position at which said means is retracted into the handle and a second position at which the handle can

[sic] be used for leverage to pry up the turf." Accordingly, the plain language of the claim itself defines the "two operable positions" as Plaintiff has defined it in the specification. *See* Apple Computer, Inc. v. Articulate Systems, Inc., 234 F.3d 14, 25 (Fed. Cir. 2000) (claim term must be read as a whole and interpreted in light of the entire claim and specification).

In light of the reasoning above, therefore, this Court construes the element "two operable positions" as:

***The two positions of the prying means when it is open to expose the prying means, and when it is retracted into the handle.***

*c. Retracted Into*

Although Plaintiff substantially agrees with Defendants as to the construction of "retracted into", it argues that the term "draw back" should be replaced with the term "pivot back." Doc. No. 54 at 4. Defendants refer to the dictionary definition of retracted in supporting their construction of "draw back." Doc. No. 56 at 8, citing to Webster's. Defendants argue that Plaintiff impermissibly limits the construction of this term to the preferred embodiment disclosed in the specification. Id.

In construing the term "retracted into," Defendants have again placed undue emphasis on a general purpose dictionary definition, and fail to interpret the disputed element in light of the intrinsic evidence. First, Defendants fail to interpret the term in light of the entire claim, and thus impermissibly attempts to isolate this disputed phrase apart from the rest of the claim language. *See* Apple Computer, 234 F.3d at 25. Defendants construction, therefore, fails to take into account that claim 1 itself defines the action of the means for prying as "being *pivotable* between two operable positions." *See* '137 Patent at 5:15-16 (emphasis added). Accordingly, the plain language of the claim already defines the action of "retracted into." In addition, the specification explicitly speaks to the "pivoting back" action when describing the prying means being retracted into the handle. *See* '137 Patent 2:43-44. Furthermore, the patentees through prosecution history estoppel limited the scope of the disputed term "retracted into" when they distinguished their claims against the Hardin prior art (U.S. Patent No. 5,449,169), specifically amending the claim to delete the term – movable –, and replacing it

with "pivotable." Accordingly, the term "retracted into" is limited through prosecution history estoppel to the action of "pivoting back," as opposed to the broader action of being "movable." *See* Doc. No. 54, Exh. B at 37.

Accordingly, for the reasons stated above, this Court construes the element "retracted into" as:

***To pivot back***

*d. The Handle Can [sic] Used for Leverage*

Defendants argue that the dictionary definitions of "second", "use" and "leverage" do not allow for this disputed phrase to be construed under 35 U.S.C. § 112, ¶¶ 2[3] and 6 because: 1) the handle cannot act as a leverage if leverage means "the action of a lever or the mechanical advantage gained by it", and a lever is:

> a rigid piece that transmits and modifies force or motion when forces are applied at two points and turns about a third; specifically: a rigid bar used to exert a pressure or sustain a weight at one point of its length by the application of a force at a second and turning at a third on a fulcrum.

Doc. No. 56 at 8-9, citing to Webster's.

In response, Plaintiff contends that the specification provides for the interpretation that the handle of the means for prying in its second, or "open" position can be used "to apply leverage to the means for prying." Doc. No. 54 at 4. Plaintiff further states that Defendants are incorrect in their dictionary interpretation of Plaintiff's device.

> In terms of defendant's definition of 'leverage,' the handle adds mechanical advantage for prying turf. . . . the handle has only one point at which force is applied - the point at which a user grips the handle during prying. The only other applied force is the reactive resistive force applied by the turf against the means for prying - the tines/shank. The fulcrum is the turf itself.

Id.

As discussed, a reviewing court must be mindful of the inherent unreliability when using only extrinsic evidence to construe claim terms. In particular, the Phillips court noted that "general dictionaries collect the definitions of a term as used not only in a particular field, but in many different settings." Here, Defendants' use of a general purpose dictionary to define the

[3] Defendants' indefiniteness arguments is addressed *infra* in conjunction with its motion for partial summary judgment.

disputed phrase results in a hyper-technical definition of the term "leverage," where Defendants require an "application of force at a second [point] and turning at a third [point] on a fulcrum." Doc. No. 56 at 9, citing to Webster's. A person of ordinary skill in the art, however, on reading the specification would recognize that the handle provides leverage, i.e. allows a mechanical advantage to a person using the device through its extended handle. In addition, a person of ordinary skill in the art would know from the specification and from his or her own knowledge that the leverage is gained through the application of force on the handle, and that force would be distributed to generate a "prying" force at the tines to allow the prying up of the turf around the ball mark. This definition of the "handle" being "used as leverage" is further supported by Defendants' own pleadings, where Defendants state that "[t]he specification and ordinary meaning of 'leverage' teach that the handle and prying means are the two points on the lever, with the turf edge as the fulcrum in between." Doc. No. 56 at 9-10. Defendants' argument, therefore, that the patent "claim[s] the handle alone somehow leverages the turf up" is not supported by a plain reading of the claim language and the specification. Id. Accordingly, for the reasons stated above, one of ordinary skill in the art would interpret the disputed phrase as:

***handle of the prying means is used as leverage to pry up the turf***

*e. Means for Releasably Locking the Means for Prying at Both Positions*

The parties agree that this disputed term falls within 35 U.S.C. § 112, ¶ 6 "means-plus-function" claim, and therefore requires that this Court: 1) determine the function claimed by the disputed phrase, and 2) "identify the corresponding structure in the written description of the patent that performs that function." Applied Medical, 448 F.3d at 1332. Although the parties appear to agree that the function is to "releasably lock the means for prying at both positions," they differ on the corresponding structure in the specification. Plaintiff identifies the corresponding structure as "rod 44, rod seat 48 and shank 4." Defendants identify the corresponding structure as a "two-position detent including a push pin and pin return spring." Plaintiff disagrees with Defendants' characterization of a "two-position detent" because it is "vague, ambiguous and undefined." Doc. No. 54 at 5.

A review of the specification reveals that the device is "releasably locking" through the action of a detent. "Preferably, a detent locks the prier in either of its two operable positions when the detent is engaged, and the detent is disengaged in response to pressure from a user's finger or thumb." '137 Patent at 2:49-52. The specification goes on to describe the detent structure:

> Referring again to FIGS. 5-7, the detent is illustrated to include a rod 44 sticking through the push pin 14 near the pin's base and projecting normally therefrom on opposite ends. As the push pin is depressed and released, the protruding ends of the rod travel parallel to the shank pivot axis in a confining channel 46 defined by the plate 34 and its boss 32. The shank defines a rod seat 48 symmetrically intersecting the shank's pivot hole in which the boss 32 is disposed. When the push pin is released the rod is urged toward the shank and, if the rod seat 48 and the rod channel 46 are aligned, the rod will be seated in the rod seat which still being in the rod channel.

'137 Patent at 4:1-12. Thus, the rod 44 and push pin 14 of the detent structure act to direct the shank into one of two operable positions. The specification also describes a "torque spring 38" which urges the shank into one of two operable positions[4] upon depression of the push pin. From this description, the detent, therefore, consists of a rod 44 that is activated via a push pin 14, and provides force through the action of a torque spring 38, to urge the shank into one of two operable positions. When the rod 44 is aligned in the rod seat 48, the shank is locked into place. *See* '137 Patent at Figs. 6-7. Accordingly, Plaintiff's construction of the detent as a "rod 44, rod seat 48 and shank" is incorrect because although the rod and rod seat act to lock the shank in place. The shank, therefore, does not form part of the detent structure. Instead, the detent consists of the rod 44, rod seat 48 and push pin 14.

For the reasons stated above, the function of the disputed phrase "means for releasably locking" is:

***to releasably lock the means for prying at both positions,***

and the corresponding structure is:

***a detent mechanism consisting of a rod, rod seat and push pin.***

---

[4] This Court agrees that the specification does not refer to the detent as a "two-position detent." Defendants' referral of the structure as a "two-position detent", therefore, is not correct.

2. Claim 2

Claim 2 recites:

> The device according to claim 1 further comprising means for spacing a grip end of a golf club up from turf beneath said means for spacing being lockable in position.

*a. The device according to Claim 1*

Although the parties appear to agree on the meaning of the phrase "the device according to claim 1" as a device incorporating the elements of claim 1, Plaintiff disputes Defendants' further characterization as "including all of the elements not meeting the requirements for patentability." Doc. No. 60 at 5. This Court agrees with Plaintiff and disregards Defendants' additional statement because it improperly assumes that the elements contested do not meet the requirements for patentability. Accordingly, the Court construes the disputed phrase as:

***the device incorporating the elements of claim 1.***

*b. Further Comprising*

The parties appear to agree in principle with the construction of the phrase "further comprising," as including additional recited elements. Plaintiff, however, appears to specifically construe the phrase as adding a specific limitation. Although disputed claim terms should be read in the context of the entire claim, the phrase "further comprising" standing alone and in light of its use in a dependent claim context, simply means that the dependent claim adds additional limitation(s). Accordingly, the phrase "further comprising" means:

***the dependent claim includes additional limitations.***

*c. Means for Spacing*

The parties agree that this disputed term falls within 35 U.S.C. § 112, ¶ 6 "means-plus-function" claim, and therefore requires that this Court: 1) determine the function claimed by the disputed phrase, and 2) "identify the corresponding structure in the written description of the patent that performs that function." Applied Medical, 448 F.3d at 1332. Both parties agree that the function of the claimed term is to "space a grip end of a golf club from the turf beneath." However, the parties disagree as to the corresponding structure in the specification. Plaintiff argues that the corresponding structure "comprises the means for prying in its prying

(second) position stuck generally vertically into the turf to create a prop upon which a golfer can rest his or her golf club shaft." Doc. No. 54 at 5. Defendants argue that the disputed phrase is indefinite because the specification does not disclose a structure that discloses this function other than the handle, shank, and blade of the means for prying, already claimed in claim 1.[5] Doc. No. 57 at 11.

A review of the specification supports sufficient corresponding structure exemplifying the function "to space a grip end of a golf club from the turf beneath." The specification first states that an object of the patent is to "provide a ball mark tool which includes a feature for propping a golf club crib above the ground." '137 Patent at 2:15-17. The specification goes on to describe a structure that spaces a golf club shaft from the turf beneath. "When the prier is in its second (fully opened) position it can be stuck generally vertically into the turf, and a concave recess defined by the handle on a side opposite the open prier can be used to cradle the shaft of a leaning golf club keeping it off wet grass below." '137 Patent at 2:57-63. The specification, therefore, clearly describes a structure for spacing the shaft of a golf club from the turf beneath as the prier specifically in its opened position where it is "generally vertically" stuck into the turf, wherein the "concave recess" in the handle can accept the golf club shaft to "cradle the shaft of a leaning golf club" and keep it off the turf beneath. Id.

The Court notes, however, that the specification only describes this spacing feature in terms of the "concave recess" or "cradle" contained within the handle. Plaintiff's more generalized description of the means for prying being "stuck generally vertically into the turf to create a prop" is therefore incorrect. Instead, the construction of this disputed phrase is limited to the cradle structure, or concave recess, in the handle of a fully opened means for spacing.

Accordingly, for the reasons stated above, the Court construes the function of the disputed phrase as:

***to space a grip end of a golf club from the turf beneath***,

---

[5] Defendants' indefiniteness arguments is addressed *infra* in conjunction with its motion for partial summary judgment.

and the corresponding structure as

> ***the means for prying in a fully opened position and stuck generally vertically in the turf, wherein the handle of the means for prying contains a concave recess or cradle***

*d. Lockable in Position*

The parties generally agree on the definition of "lockable in position." Plaintiff contends that the disputed phrase should be construed as the means for spacing being "lockable" in its fully opened position. Doc. No. 57 at 5. Defendants substantially agree, stating that the phrase "lockable in position" means that the means for spacing is locked at a point or area. Doc. No. 60 at 7. Defendants argue, however, that the claim element is indefinite, and therefore invalid, because the specification lacks "a structure in addition to the structures claimed in claim 1."[6] Doc. No. 57 at 13. This Court, however, must attempt to first construe the claim language prior to a finding of invalidity. *See* Intervet America, Inc. v. Kee-Vet Laboratories, Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("Ambiguity, undue breadth, vagueness, and triviality are matters which go to claim validity for failure to comply with 35 U.S.C. § 112 ¶ 2, not to interpretation or construction."); Harrah's Entertainment, Inc. v. Station Casinos, Inc. 321 F.Supp.2d 1173, 1176 (D. Nev. 2003) ("[T]he court must attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness.").

A review of the specification reveals that when the means for spacing is used to space a grip end of a golf club up from the turf beneath, the means for spacing is "in its second (fully opened) position ... stuck generally vertically into the turf, and a concave recess be used to cradle the shaft of a leaning golf club." '137 Patent 2:59-62. The specification goes on to explain that the means for spacing is locked by a detent mechanism to be in its second, or fully opened, position. Id. at 3:65-67. The specification, therefore, supports this functional aspect of the disputed element, and describes the means for spacing as being fully opened, and "lockable" in position, as detailed in a preferred embodiment by a detent mechanism. Accordingly, the phrase "said means for spacing being lockable in position" is construed as:

---

[6] Defendants' indefiniteness arguments is addressed *infra* in conjunction with its motion for partial summary judgment.

***the means for spacing being lockable when the means for prying is in its fully opened position***

3. Claim 3

Claim 3 recites:

> The device according to claim 2[7] further comprising[8] means for cutting a cylindrical plug out of an end of a cigar.

*a. Means for Cutting*

The parties agree that this disputed term falls within 35 U.S.C. § 112, ¶ 6 "means-plus-function" claim, and therefore requires that this Court: 1) determine the function claimed by the disputed phrase, and 2) "identify the corresponding structure in the written description of the patent that performs that function." Applied Medical, 448 F.3d at 1332. Both parties agree that the function of the claimed term is to "cut a cylindrical plug from the end of a cigar." However, the parties dispute as to the corresponding structure in the specification. Plaintiff asserts that the corresponding structure is a cylindrical cutting blade 22 disclosed in the specification. Doc. No. 54 at 6. Defendant contends that the claim is invalid because it does not enable one of ordinary skill in the art to make and use the invention.[9] Doc. No. 57 at 15-16. As discussed, because this Court must first attempt to construe the claim language prior to a finding of invalidity, the Court finds this disputed phrase amenable to claim construction.

The parties agree that the "means for cutting"consists of at least the cylindrical cutting blade 22. *See* Doc. No. 54 at 6; Doc. No. 57 at 15. Defendants add on several other structural elements, including that the "circular cutting blade ... is affixed to and around the margin of a circular hole defined in the bottom of a concentric recess defined in the handle's backside and faces a though-hole [sic] that is congruent with the recess and is defined in the handle's front side." Doc. No. 57 at 15. A review of the specification does not support Defendants'

[7] As discussed for claim 2, the phrase "the device according to" in all subsequent claims is construed to mean "a device incorporating the elements of the claim depended therefrom."

[8] As discussed for claim 2, the phrase "further comprising" in all subsequent claims is construed to mean "the dependent claim includes additional limitations."

[9] Defendants' non-enablement argument is addressed *infra* in conjunction with its motion for partial summary judgment.

construction. Although the specification does discloses that the circular cutting blade is affixed to the base of a depression defined by the handle of the device, *see* '137 Patent at 2:64-3:1, the cutting mechanism lies within the circular cutting blade, and not the additional structural elements that Defendants' contend. The specification, therefore, supports construction of the "means for cutting" as corresponding to the circular cutting blade described.

Accordingly, the means plus function phrase of claim 3 is construed as having the function of:

***to cut a cylindrical plug from the end of a cigar***,

and the corresponding structure construed as:

***a circular blade.***

4. Claim 4

Claim 4 recites:

> The device according to claim 2 wherein the means for spacing comprises:
> a) the means for prying being in its second position so that it can be generally vertically inserted into turf, and
> b) cradle means, defined by the handle on a side opposite the means for prying, for vertically supporting the shaft of a leaning golf club.

*a. Means for Prying Being in its Second Position*

Plaintiff disagrees with Defendants on two points: 1) that Defendants' use of the "blade or shovel-like head" as a means for prying is improper; and 2) Defendants' use of an extrinsic dictionary definition of "generally." Doc. No. 54 at 6.

First, as discussed, the means for prying incorporates the "blade or shovel-like head" as corresponding structures in the specification. Accordingly, the means for prying in this disputed phrase could incorporate not only a structure with a plurality of tines, but also a blade or shovel-like head as disclosed in the specification. Plaintiff's argument, therefore, is not persuasive because as construed in independent claim 1, the means for prying can incorporate a blade or shovel-like head.

In addition, although Plaintiff is correct in questioning Defendants' use of a dictionary definition for "generally," there is no conflict between the two parties' definitions. Defendants assert that generally means "in a general manner, in disregard of specific instances and with regard

to an overall picture." Doc. No. 57 at 17. Both parties, therefore, agree that "generally vertically inserted" means that the means for prying is "inserted such that it is overall upright." Doc. No. 60 at 10. Accordingly, Defendants' use of a dictionary definition comports with Plaintiff's construction, and there is no conflict regarding the construction of this term.

Defendants also argue that the claim is indefinite for failing to describe a separate structure for the means for prying element.[10] Doc. No. 60 at 11. As discussed, because this Court must first attempt to construe the claim language prior to a finding of invalidity, the Court finds this disputed phrase amenable to claim construction. Claim 1 defines the term "second position" as a position "at which the handle can [sic] used for leverage to pry up the turf." This Court has already construed this phrase as when the "handle of the prying means is used as leverage to pry up the turf." The term "second position," therefore defines the position of the prying means when it is used as leverage to pry up the turf, or when the device is fully opened. *See* '137 Patent at 2:58-60 ("When the prier is in its second (fully opened) position it can be stuck generally vertically into the turf."). Accordingly, the phrase "means for prying being in its second position" is construed as:

***The means for prying being in its second, or fully opened, position***.

*b.* *Cradle Means*

The parties disagree as to whether this claim is within a "means plus function" definition. Plaintiff argues that the phrase "cradle means" is not a means plus function phrase because the claim goes on to describe a defined structure. Doc. No. 54 at 7. Defendants contend it is a means plus function, and define the function as vertically supporting the shaft of a golf club. Doc. No. 57 at 17.

"A claim limitation that actually uses the word 'means' invokes a rebuttable presumption that § 112 ¶ 6 applies. By contrast, a claim term that does not use 'means' will trigger the rebuttable presumption that § 112 ¶ 6 does not apply." CCS Fitness, 288 F.3d at 1369. "The use of the term "means' is 'central to the analysis,' because the term 'means,' particularly as

---

[10] Defendants' indefiniteness arguments is addressed *infra* in conjunction with its motion for partial summary judgment.

used in the phrase 'means for,' is 'part of the classic template for functional claim elements.'" Lighting World, 382 F.3d at 1358, quoting Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1427 (Fed. Cir. 1997). This presumption can be rebutted if a claim recites "sufficiently definite structure," but need not "'connote a precise physical structure." Watts v. XL Systems, Inc., 232 F.3d 877, 880 (Fed. Cir. 2000). "As an aid in determining whether sufficient structure is in fact recited by a term used in a claim limitation, this court has inquired into whether the 'term, as the name for structure, has a reasonably well understood meaning in the art." Id. at 880-881.

A review of the claim language does not support Plaintiff's contention. Plaintiff states that the "cradle means" feature describes sufficient structure to bring the claim out of the § 112, ¶ 6 requirement. The claim states "cradle means, defined by the handle on a side opposite the means for prying." However, the claim language, read in light of the specification, does not provide sufficient structure to rebut the presumption of means plus function language. The language only defines the "cradle means" as part of the handle and opposite the means for prying, and therefore is insufficient for giving a "definite structure." Moreover, Plaintiff's construction, in light of the Court's construction of claim 2, would define a "cradle means" as broader than the "means for spacing" of claim 2. Because the instant claim depends on claim 2, this would be an improper construction of this dependent claim. Accordingly, the Court rejects Plaintiff's contention and finds that "cradle means" is a means plus function claim.

Defendants further argue that although "cradle means" is a means-plus-function claim, and the function is to vertically support the shaft of a leaning club, the claim is nonetheless invalid because the specification fails to provide a corresponding structure, and the claim is indefinite under 35 U.S.C. § 112, ¶ 2.[11] As discussed, because this Court must first attempt to construe the claim language prior to a finding of invalidity, the Court finds this disputed phrase amenable to claim construction.

In light of the claim language following the disputed term "cradle means," the Court

[11] Defendants' indefiniteness arguments is addressed *infra* in conjunction with its motion for partial summary judgment.

finds that the function of this "means-plus-function" term is "to vertically support the shaft of a leaning club." *See* '137 Patent at 5: 33-34. After reviewing the specification, this Court finds that there is corresponding structure described within the body of the '137 Patent. For example, the '137 Patent describes a:

> [C]radle feature specifically designed for keeping a club grip off wet grass. A club's head can rest o n the turf while its shaft leans on the cradle to keep the grip spaced from the turf.

'137 Patent at 1:53-56. The '137 Patent goes on to describe a "cradle defined in its handle for propping a golf club grip above the ground." Id. at 2:19-20. The specification then describes in detail how the invention props a golf club grip above the ground:

> Referring to FIGS. 1 and 2, an end 50 of the handle 6 opposite the prier, when the prier is opened, is concave to act as a support cradle for a golf club grip. The cradle is generally centered in the end of the handle and preferably has a radius suitable to accommodate the grip end of a golf club shaft. The cradle is also deep enough to confine the shaft when the cradle is generally upright. In operation, a user opens the prier and sticks it in the ground so that the handle is generally vertical with the cradle facing upward. A golf club can then be propped with its shaft or grip resting in the cradle, and thus supported above the turf.

Id. at 4:46-56. The specification, therefore, provides corresponding structure to the "cradle means" as a concave recess "generally centered in the end of the handle." Accordingly, this Court hereby construes the function of the disputed phrase as:

***to vertically support the shaft of a leaning club***,

and the corresponding structure as a:

***concave recess generally centered in the end of the handle.***

5. Claim 5

Claim 5 recites:

> The device according to claim 1 further comprising means for cutting a cylindrical plug out of an end of a cigar.

As discussed, the Court previously construed the disputed phrase "means for cutting" as a means plus function claim having the function of:

***to cut a cylindrical plug from the end of a cigar***,

and the corresponding structure as:

***a circular blade.***

*See* section II.A.3, *supra*.

6. Claim 6

Claim 6 recites:

> The device according to claim 5 wherein the means for cutting comprises:[12]
> a) a depression defined by the handle, the depression being sized in girth for an end of a cigar to press against a base of the depression, and
> b) a circular cutting blade affixed to the handle at the base of the depression.

*a. A Depression Defined by the Handle*

The parties disagree as to the definition of "depression" in the disputed claim phrase. Plaintiff, citing to the specification, construes depression as a "recessed area relative to the outer service of the handle." *See* Doc. No. 54 at 8. Defendants, citing to Webster's, defines depression as "an act of depressing or a state of being depressed: as a pressing down: lowering or depressed place or part: hollow." Doc. No. 57 at 18.

As discussed, the Federal Circuit views the use of extrinsic evidence, such as dictionaries and treatises, as "less reliable," especially when not used in conjunction with intrinsic evidence, such as the specification. *See* Phillips, 415 F.3d at 1318. Here Defendants, contrary to the teachings in Phillips, ignore the specification to fully adopt the extrinsic definition cited. The Court first notes that the specification describes the depression of the "means for cutting" as:

> [D]efined by the handle, the depression being large enough in girth for an end of a cigar to press against a base of the depression, and a circular cutting blade is affixed to the base of the depression. Preferably the depression intersects the prier slot, and the prior [sic] blocks access to the cutting blade whenever the prior [sic] is in its first (retracted) position.

'137 Patent at 2:64 - 3:4. In addition, the specification provides several views of the depression in figures 2, 4 and 5 (*see* feature 26), which appears as a physical recess within the handle. One of ordinary skill in the art viewing the specification, therefore, would not define the term "depression" as "an act of depression or a state of being depressed" or even "as a pressing down: lowering" or "hollow" spot. Instead one of ordinary skill in the art reading the specification and without the aid of a dictionary, and from the plain and ordinary meaning of the word, would

---

[12] As in claim 2 for the disputed phrase "The device according to," this Court construes the phrase "wherein the [feature] comprises" in all subsequent claims as incorporating elements of the feature being referred to, and not, as Defendants contend "including all of the elements not meeting the requirements for patentability."

construe the term as "a depressed place or part," or a "physical recess." Accordingly, using the specification and the knowledge of one of ordinary skill in the art, the term "depression" should mean a "physical recess."

Defendants go on to combine the dictionary definition of "defined" with "depression" to conclude that the phrase "depression defined by the handle" should be construed as "a hollow in the handle with the limits of the hollow demarcated by the handle." Doc. No. 57 at 19. For the same reasons above, Defendants' construction is incorrect because it does not reflect the specification or what one of ordinary skill in the art would conclude. First, the depression should not be construed as a "hollow." Defendants fail to provide support in the specification for the construction or description of the physical depression as a "hollow." Furthermore, the physical depression should not be further delineated as the "limits of the hollow demarcated by the handle." Although Defendants construe the term "defined" as "to fix or marks the limits of: demarcate" through the use of a general purpose dictionary, other dictionaries also list the definitions of "defined" as "to describe the nature or basic qualities of" or "to delineate the outline or form of." *See* AMERICAN COLLEGE HERITAGE DICTIONARY at 364. Thus, as found by the Phillips court, because of differing interpretations of the same word by different dictionaries, "[a] claim should not rise or fall based upon the preferences of a particular dictionary editor." 415 F.3d at 1322. Instead, the Court should look to the specification, which describes the physical recess as within the handle structure of the device, but does not describe the handle structure as demarcating the boundaries of the physical recess. *See* '137 Patent at 31-32 ("... the margin of a circular hole defined in the bottom of a concentric recess defined in the handle's back side."). Accordingly, the phrase "a depression defined by the handle," is construed as:

***a physical recess within the handle of the device.***

*b. Sized in Girth for An End of a Cigar*

Defendants assert that the phrase should read "the depression, as measured around it, would allow reception of an end of a cigar." Doc. No. 57 at 19. Although Defendants again rely on dictionary definitions of "girth" to come to their construction, Defendants' dictionary

definition does not vary considerably from what one of ordinary skill in the art viewing the specification would conclude. The disputed phrase in claim 6 refers to the "depression" of the means for cutting, which the specification refers to as being "large enough in girth for an end of a cigar to press against a base of the depression." '137 Patent 2:64-66. The phrase "being sized in girth for an end of a cigar," therefore means that the depression is large enough in girth to allow reception of a cigar, in this case to press against the base of the depression referred to.

Plaintiff contends that this phrase should be construed as "sized in girth to allow an end of a cigar to pass through to be cut by cutting blade 22." Doc. No. 54 at 8. Plaintiff again impermissibly limits its claim construction to the preferred embodiment. *See* Playtex Products, Inc. v. Procter & Gamble Co., 400 F.3d 901, 907-908 (Fed. Cir. 2005); Amgen, Inc. v. Hoescht Marion Roussel, Inc., 314 F.3d 1313, 1325 (Fed. Cir. 2003) ("[C]ourts must take extreme care when ascertaining the proper scope of the claims, lest they simultaneously import into the claims limitations that were unintended by the patentee."). "Claims of a patent may only be limited to a preferred embodiment by the express declaration of the patentee." Playtex, 400 F.3d at 908, citing Karlin Technology, Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 973 (Fed. Cir. 1999). The Court, thus, disregards Plaintiff's construction of this term.

Accordingly, for the reasons stated above, the phrase "sized in girth for an end of a cigar" is construed as:

***the depression being sized to allow the reception of the end of a cigar.***

*c. Base of the Depression*

Defendants contend that the phrase "base of the depression" means "the bottom of the hollow or indentation." Doc. No. 57 at 18-19. Plaintiff does not comment on the construction of this phrase. As discussed, the term "depression" should not be limited to a "hollow" as defined by extrinsic evidence. Instead, the specification, the knowledge of one of ordinary skill in the art, and the plain and ordinary meaning of the disputed element make clear that the depression is a physical recess. Accordingly, this phrase is construed as:

***the base of the physical recess***

///

*d. A Circular Blade Affixed to the Handle at the Base of the Depression*

Defendants construe this disputed phrase as "a round blade for cutting [that] is physically attached at the base of the depression." Doc. No. 60 at 14. Although Defendants rely on dictionary definitions of individual terms within, this phrase can be construed from the ordinary meaning of the terms, as well as from the specification and the knowledge of one of ordinary skill in the art. The phrase "circular blade for cutting" is construed by its ordinary terms as a blade for cutting that is circular. Similarly, the term "affixed" is construed by an ordinary person skilled in the art, as well as by its plain, ordinary meaning, as being fixed in position, or attached. Defendants' use of dictionary terms, although not in dispute with the plain ordinary meaning of the phrase, is not necessary for its construction.

Plaintiff argues that although the term "circular cutting blade" should be defined by its ordinary meaning, it goes on to argue that a preferred embodiment of the claim describes how the circular blad eis attached to the base of the depression. As discussed, Plaintiff cannot import limitations from the preferred embodiment into the claim. *See* Playtex Products, 400 F.3d at 907-908; Amgen, 314 F.3d at 1325. Instead, the Court construes this disputed claim by its plain and ordinary meaning, and from the specification. Accordingly, the phrase "a circular cutting blade affixed to the handle at the base of the depression" is construed as:

***a circular blade for cutting attached to the base of the depression***.

7. Claim 7

Claim 7 recites:

> The device according to claim 6 wherein the depression intersects the opening defined by the handle for the means for prying which blocks access to the cutting blade whenever the means for prying is in the opening.

*a. The Depression Intersects the Opening*

Although the parties appear to partially agree on the term "intersects" as "meeting" and/or "crossing at a point," the parties disagree on the meaning of the phrase "depression intersects the opening." Defendants, using a dictionary meaning, define this phrase as "a depression that meets and crosses the opening in the handle." Doc. No. 56 at 20. Defendants construction of "intersect" does not comport with the teachings in the specification and what

one of ordinary skill in the art would construe the phrase in light of the specification. The specification, instead, describes the depression as "intersect[ing] the prier slot," with the drawings showing the prier slot 12 as positioned in the immediate proximity of the depression 26. *See* '137 Patent, Fig. 4. The specification, therefore, does not support that the depression "meets and crosses" the opening. Instead, the specification supports that the depression, or physical recess, meets at a point defined by the "handle for the means for prying."

Plaintiff argues that the phrase is "illustrated and described in a preferred embodiment" in the specification. Doc. No. 60 at 15. Plaintiff again appears to improperly limit the meaning of the phrase to the preferred embodiment of the specification, attempting to introduce specific limitations of "depression" as "a recessed area relative to the outer surface of the handle." Instead, this Court construes the claim according to its ordinary meaning and from the viewpoint of one of ordinary skill in the art when reading the specification. Embrex, 216 F.3d at 1347. For the reasons stated above, therefore, the phrase "depression intersects the opening" is construed as:

***a depression that meets in the opening defined by the handle for the means for prying***.

*b. Which Blocks Access to the Cutting Blade*

The parties disagree as to the construction of the phrase "which blocks access to the cutting blade." Plaintiff uses the ordinary meaning of the terms, as well as using the preferred embodiment in the specification, to construe the phrase as "the means for prying blocks access to the cutting blade if retracted into the handle." Doc. No. 54 at 9. Defendants use dictionary definitions of "block" and "access" to construe the phrase as "the means for prying makes it unsuitable for passage to or communication with the cutting blade." Doc. No. 57 at 21.

The Court finds that this phrase can be construed by its ordinary meaning, without resort to extrinsic evidence. Here, the disputed phrase refers to the action of blocking access to the cutting blade "whenever the means for prying is in the opening." *See* '137 Patent at 6:5-6. Thus, looking at the context which the disputed phrase lies, as well as the knowledge of one of ordinary skill in the art reading the specification, the disputed phrase in its ordinary terms would mean that when the means for prying is in the opening, access is blocked to the cutting

blade. Defendants, therefore, do not need to resort to a dictionary definition to construe the terms "block" and "access" because the ordinary meaning and the context of the disputed phrase can be used to construe the terms. Accordingly, for the reasons stated above, the phrase "which blocks access to the cutting blade" is construed as:

> ***the means for prying blocking access to the cutting blade when the means for prying is in the opening***.

8. Claim 8

Claim 8 recites:

> The device according to claim 1 wherein the means for prying comprises an opening defined by the handle in which the means for prying is disposed when in its first position.

As an initial matter, Plaintiff alleges that claim 8 as written contains typographical and clerical errors that this Court allegedly has the power to correct. Doc. No. 54 at 9, citing to Novo Indus. LP v. Micro Molds Corp., 350 F.3d 1348, 1357 (Fed. Cir. 2003). Citing to Novo Indus, Plaintiff asserts that "[a] district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." Id. at 9-10. Plaintiff contends that errors were inadvertently introduced during attempts to amend claim 5. *See* id. at 11. Plaintiff points to support in the specification, concluding that claim 8 should now read:

> The device according to claim 1 further comprising an opening defined by the handle in which the means for prying is disposed when it [sic] its first position.

Id. (emphasis in original). Defendants disagree that Novo Indus. applies.

In Novo Indus., the Federal Circuit looked directly at the issue of whether a district court could correct "any and all errors that the PTO would be authorized to correct" under the applicable statutes. 350 F.3d at 1356. The court concluded that the statute, as well as the inability of the PTO to correct certain classes of errors, limits the district court's correction ability to only a defined subset of errors. Id. The Federal Circuit acknowledged that while the courts "can continue to correct obvious minor typographical and clerical errors in patents ... major errors are subject only to correction by the PTO." Id. at 1357.

The correction that Plaintiff now requests this Court make is not a "minor" error, but ultimately changes the meaning of the claim. Plaintiff requests that this Court substitute:

> The device according to claim 1 <u>wherein the means for prying comprises</u> an opening defined by the handle,

with:

> The device according to claim 1 <u>further comprising</u> an opening defined by the handle.

Doc. No. 54 at 11 (emphasis added). Thus, Plaintiff attempts to redefine the device by making the "means for prying" sub-component of claim 1 no longer defined by "an opening defined by the handle," but the entire device itself now "further comprising an opening defined by the handle." This change, even if supported by the specification or prosecution history, is subject to reasonable debate because of the major change in the language. For these reasons, this Court, therefore, DENIES Plaintiff's request to make clerical or typographical corrections to claim 8.

*a.* *<u>An Opening Defined by the Handle</u>*

The parties first disagree as to the construction of the phrase "an opening defined by the handle." Plaintiff asserts that the ordinary meaning of this phrase is "the handle includes an opening." Doc. No. 54 at 9. Defendants use dictionary definitions of individual terms to interpret this phrase.

The Court finds that the disputed phrase can be construed through its ordinary meaning, as well as from intrinsic evidence. Here, the phrase "an opening defined by the handle" further describes the "means for prying." Accordingly, the phrase "an opening defined by the handle" can be construed by its ordinary meaning to be:

***an opening of the means for prying which is defined by the handle***

*b.* *<u>Means for Prying is Disposed When in its First Position</u>*

Although the parties appear to substantially agree on the construction of this phrase as "when the means for prying is in its first position," Plaintiff further adds that the phrase is also limited to "when the means for prying is ... is disposed in the handle." Doc. No. 54 at 9. Although Plaintiff again attempts to improperly import limitations from the preferred embodiment, the Court notes that claim 1, from which claim 8 depends, defines the first

position as when the means for prying is "retracted into the handle." Plaintiff's construction, therefore, is supported by the context of the disputed claims.

Defendants' construction of the "means for prying is in the opening en [sic] ... in its first position," does not substantially differ from Plaintiff's construction, except as to the further construction of the term "first position." As discussed, this Court finds support for the definition of "first position" as the means for prying being retracted in the language of independent claim 1, from which claim 8 ultimately depends from. For these reasons, this Court therefore construes the phrase "means for prying is disposed when in its first position" as:

***means for prying when it is retracted into the handle***.

9. Claim 9

Claim 9 recites:

> The device according to claim 8 wherein the means for prying comprises a shank and a plurality of tines projecting therefrom.

*a. A Shank*

The parties disagree as to the scope of this disputed element. Plaintiff asserts that the term should be construed as "a connective part of the means for prying." Doc. No. 54 at 12. Using a dictionary definition, Defendants construe the disputed phrase as "a part of an object by which it can be attached." As discussed, extrinsic evidence can be used to a construe a claim if the extrinsic definition comports with intrinsic evidence, including the plain and ordinary language of the claims. Phillips, 415 F.3d at 1319. In the instant matter, although Defendants' dictionary definition does comport with the specification, the context that the disputed claim appears does limit the "shank" as part of the means for prying. Here, the specification makes clear that the shank is a connective element of the means for prying, which describes a shank on the prier means as "pivotally connected to the handle." '137 Patent at 3:25-26. However, the claim language limits this connective structure or element as part of the means for prying. *See* id. at 6:11-13 ("the means for prying comprises a shank). Accordingly, for the reasons stated above, the Court construes "a shank" as:

***a connective structure of the means for prying***.

*b.* *Plurality of Tines Projecting Therefrom*

Although the parties substantially agree on the meaning of the disputed phrase "plurality of tines projecting therefrom," they disagree as to the scope of this phrase. Plaintiff asserts that the disputed phrase means "the prier can include multiple tines, like the tines of a fork." Defendants again use dictionary meanings to interpret this phrase as "numerous slender pointed parts."

First, the phrase "plurality" is a commonly used term in patent claim language having no set meaning, but instead should be interpreted in the context of the specification. In Bilstad v. Wakalopulos, 386 F.3d 1116 (Fed. Cir. 2004), the Federal Circuit agreed with the Patent Board's construction of the phrase plurality as connoting an "indefinite numerical range." Id. at 1122. The Board noted that the term could relate to two objects, or could refer to large numbers of multiples. Id. In the instant matter, the term "plurality" could also mean as little as two in view of the specification's disclosure as well as the knowledge of one of ordinary skill in the art. Accordingly, the term "plurality" is construed in light of the specification and disclosure as "at least two."

In regards to the term "tines," the Court finds that the specification and plain and ordinary meaning of the term allows construction without resort to extrinsic evidence. The specification describes the term "tines" as preferable because they "make small holes, are long enough to penetrate the turf deep enough to pry up a mark." '137 Patent at 4: 67-5:2. This description, as well as the illustration of the tines as slender and long, *see* id. at Fig. 1, features 10A and 10B, agrees with the construction of the term "tines" as "slender projections." The parties' arguments substantially agree with this construction. Compare Doc. No. 60 at 19 ("tines of a fork" and "slender pointed parts"). The Court, therefore, construes the phrase "plurality of tines projecting therefrom" as:

***at least two slender projections projecting from the means for prying***

10. Claim 10

Claim 10 recites:

> The device according to claim 8 further comprising means for urging the means for prying to its second position whenever the means for prying is

released from being locked in its first position.

*a. Whenever the Means for Prying is Released from being Locked in its First Position*

Plaintiff argues that the preferred embodiment of the specification means that the phrase is limited to the biasing force when the means for prying is unlocked from its retracted position, allowing the biasing spring to "urge" the means for prying into its second position. Doc. No. 54 at 13. Defendants, however, counter using the dictionary definition of individual terms as "any or every time the means for prying is set free from its first position." Doc. No. 57 at 25.

The ordinary meaning of the disputed phrase, as well as the knowledge of one of ordinary skill in the art reading the specification, is sufficient for this Court to construe this phrase. The specification gives ample examples and disclosure on the mechanism of the "detent" structure, and the action of a torque spring to urge the shank into the "second" or fully opened position when the push pin is depressed while the means for prying is in its "first" or retracted position:

> To unlock the shank, the pin 14 is pushed down until the rod is unseated, as best illustrated in FIG. 7, freeing the shank to pivot on boss 32. Once the shank is unlocked, the torque spring 38 urges it to swing out to its fully opened position if it was retracted, or force can be applied to retract the shank if it was opened.

'137 Patent at 14-21. In addition, independent claim 1 recites the "first position" of the means for prying as "retracted into the handle." Thus, the phrase can be construed in the context of the entire claim as the action of the means for prying by the torque spring of the detent system when it is released from its first, or retracted, position. Accordingly, the phrase "whenever the means for prying is released from being locked in its first position," in light of the specification and the context of the claim, can be construed as:

***when the means for prying is released from its retracted position***

11. Claim 11

Claim 11 recites:

> The device according to claim 10 further comprising:
> a) a detent for locking the means for prying in either of its two operable positions when the detent is engaged, and
> b) means for disengaging the detent in response to pressure from a user's finger or thumb.

*a. Detent for Locking the Means for Prying In Either of its Two Operable*

<u>*Positions when the Detent is Engaged*</u>

The parties both use extrinsic evidence to define the term "detent," and arrive at the same construction of this term as "a mechanism for positioning and holding one mechanical part in relation to another so that the device can be released by force applied to one of the parts." This construction is in agreement with the use of the term "detent" in the specification. The specification describes a "detent" as "lock[ing] the prier in either of its two operable positions when the detent is engaged, and the detent is disengaged in response to pressure from a user's finger or thumb." '137 Patent at 2:49-52. Accordingly, the Court construes the term "detent" as:

***a mechanism for positioning and holding a mechanical part in relation to another, where the device can be released by force applied to one of the parts***

In regards to the remaining phrase "locking the means for prying in either of its two operable positions when the detent is engaged," the Court construes this phrase by its ordinary meaning, and by what one of ordinary skill in the art would construe the phrase in light of the context of this claim language, as well as the entire specification.[13] Defendants argue that the term "engaged" should be taken from its dictionary definition of "to interlock with: mesh: to cause (mechanical parts) to mesh." Doc. No. 56 at 26. Although Defendants fail to look to intrinsic evidence to determine if the dictionary definition comports with the specification or accompanying disclosure, *see* <u>Phillips</u>, 415 F.3d at 1319, Defendants' construction of the term "engaged" does not disagree with the specification or ordinary meaning of the claims. Here, the specification describes the operation of the detent as "lock[ing] the prier in either of two operable positions when the detent is engaged." '137 Patent at 2:49-52. The specification further describes the engagement of the detent as "whenever the pin (in the detent mechanism) is at said one extent of its range and the prier is in one of its two operable positions. <u>Id</u>. at 2:55-57. In addition, the plain and ordinary meaning of the term comports with construction of engaged as the detent being "meshed" or "interlocked" with the prier. Defendants' attempts,

[13] Plaintiff also disagrees with Defendants' construction because the disputed phrase "is not a means plus function recitation." Doc. No. 60 at 22. The Court notes that Defendants do not present any arguments that this phrase is a means-plus-function claim.

therefore, at introducing extrinsic dictionary evidence to construe the term "engaged" agrees with the specification and ordinary meaning of the term. Accordingly, the Court construes the phrase "a detent for locking the means for prying in either of its two operable positions when the detent is engaged" as:

> ***a mechanism for positioning and holding the means for prying in either of its two operable positions when it is interlocked or meshed with the means for prying.***

*b. Means for Disengaging the Detent in Response to Pressure From a User's Finger or Thumb*

The parties agree that this disputed term falls within 35 U.S.C. § 112, ¶ 6 "means-plus-function" claim. As discussed, in order to properly construe this claim, this Court must: 1) first determine the function of the function claimed; and 2) identify the corresponding structure in the specification. Applied Medical, 448 F.3d at 1332.

Although both parties agree on the defined function of this means plus function claim, they disagree as to the identification of the corresponding structure. Both parties substantially agree that the function of this phrase is "for disengaging the detent in response to force applied by a user's finger or thumb." Doc. No. 60 at 23. Plaintiff identifies the corresponding structure as the "push pin 14 and the spring 30, best shown in Figs. 6 and 7." Doc. No. 54 at 13. Defendants argue that the claim is invalid for indefiniteness and non-enablement.[14] Doc. No. 57 at 27-28.

A review of the specification reveals that the corresponding structure is sufficiently disclosed:

> To unlock the shank, the pin 14 is pushed down until the rod is unseated, as best illustrated in FIG. 7, freeing the shank to pivot on boss 32. Once the shank is unlocked, the torque spring 38 urges it to swing out to its fully opened position if it was retracted, or force can be applied to retract the shank if it was opened.

'137 Patent at 4:15-21. Thus, the specification identifies the push pin as the means for disengaging the detent. Accordingly, the Court construes the function of the phrase "means for

[14] Defendants' indefiniteness arguments is addressed *infra* in conjunction with its motion for partial summary judgment.

disengaging" as:

***for disengaging the detent in response to force applied by a user's finger or thumb***,

and the corresponding structure as:

***a push pin***.

12. Claim 12

Claim 12 recites:

> The device according to claim 11 wherein the means for disengaging, the detent comprises:
> a) a push pin movable axially over a range, and
> b) means for biasing the pin to reside at one extent of its range, the detent being engaged whenever the pin is at said one extent of its range and the means for prying is in one of its two operable positions.

*a. Means for Biasing the Pin to Reside at One Extent of its Range*

The parties agree that this disputed term falls within 35 U.S.C. § 112, ¶ 6 "means-plus-function" claim. As discussed, in order to properly construe this claim, this Court must: 1) first determine the function of the function claimed; and 2) identify the corresponding structure in the specification. Applied Medical, 448 F.3d at 1332.

The parties do not disagree on the function of this phrase as "biasing the pin to reside at one extent of its range." Doc. No. 54 at 14; Doc. No. 57 at 29. The parties, however, disagree as to the corresponding structure in the specification. Plaintiff contends that the corresponding structure is the "helical spring 30 as best shown in Figures 6 and 7." Doc. No. 54 at 14. Defendants contend that the claim is invalid because there is no structure corresponding to this function in the specification.[15] Doc. No. 57 at 29.

A review of the patent supports a corresponding structure in the specification. First, the specification discloses that the detent can be disengaged "by a push pin in the handle, the pin being movable axially over a range and biased to reside at one extent of its range." '137 Patent at 2:52-56. The specification goes on to describe how the push pin is biased to reside at one of two operable positions:

> The top of the pin is exposed on one side of the handle so that it can be depressed

[15] Defendants' indefiniteness arguments is addressed *infra* in conjunction with its motion for partial summary judgment.

> axially, e.g. pushed down by a user's finger or thumb, to unlock the shank. Preferably the top of the push pin is flush with the handle. When depressed, the push pin is biased to return to a normal, undepressed position, and when the pin is in its normal position the shank is locked in place at either of two positions: fully opened or retracted.

'137 Patent at 3:35-42. The specification goes on to describe the "compression spring 30" that biases the push pin to a normal position:

> Referring to FIGS. 5-7, a compression spring 30 is disposed around the push pin 14, in an annular space defined by the handle 6, to resist depression of the pin.

'137 Patent at 3:58-61. The drawings referred to provide additional support for the compression spring as the force that biases the push pin 14 to a normal position. Thus, the specification discloses a corresponding structure of a compression spring that biases the push pin of the claim. For the foregoing reasons, the function of the disputed term "means for biasing" is:

***biasing the pin to reside at one extent of its range***

and the corresponding structure is:

***a compression spring***.

*b.* *Engaged Whenever the Pin is at Said One Extent of its Range*

Plaintiff construes this phrase as "when the pin is residing where the biasing force is urging it to reside and the prier is either retracted or in prying position, the detent is engaged." Doc. No. 54 at 14. Defendants use dictionary definitions of individual terms to construe this phrase as "the detent is interlocked when the pin is at one point of its range." Doc. No. 60 at 26.

Here, the Court finds that the context of the disputed phrase further defines the structure of the detent when engaged as "whenever the pin is at said one extent of its range and the means for prying is at one of its two operable positions." The specification describes a "detent" as "lock[ing] the prier in either of its two operable positions when the detent is engaged, and the detent is disengaged in response to pressure from a user's finger or thumb." '137 Patent at 2:49-52. Moreover, the specification, as discussed, discloses the relation between the push pin and means for prying, through the shank:

> The top of the pin is exposed on one side of the handle so that it can be depressed

> axially, e.g. pushed down by a user's finger or thumb, to unlock the shank. Preferably the top of the push pin is flush with the handle. When depressed, the push pin is biased to return to a normal, undepressed position, and when the pin is in its normal position the shank is locked in place at either of two positions: fully opened or retracted.

'137 Patent at 3:35-42. The specification and ordinary meaning of the terms, therefore, allow the Court to construe the phrase as:

> ***the detent operating when the pin is biased to one extent of its range and the means for prying is in one of its two operable positions***

13. <u>Claim 13</u>

Claim 13 recites:

> The device according to claim 12 wherein the means for urging the means for prying comprises a <u>torque spring</u>.

*a.* *<u>Torque Spring</u>*

Although the parties substantially agree on the construction of the phrase "torque spring," they differ as to the scope of the disputed claim term. Defendants, using dictionary definitions of the individual terms "torque" and "spring", define a "torque spring" as "an elastic device that recovers its original shape when released after being distorted and that produces torsion or rotational force." Doc. No. 57 at 30. Plaintiff's definition slightly differs, asserting that the term is "a device that stores energy when stretched and released, the stored energy is released as torque." Doc. No. 54 at 14.

The specification does not explicitly define torque spring, but describes a torque force created with the action of a coiled spring feature when the coiled spring is "wound tighter when the shank is retracted and exerts a torque on the shank urging the prier to be in the fully opened position." '137 Patent at 3:58-61. One of ordinary skill in the art, therefore, reading the specification would surmise that the torque spring is a component of the device that exerts a torque force after being released, the energy of the spring originating from being wound about the shank.

Although Defendants argue that the term "torque spring" should be broadened to include "an elastic body or device," the Court does not find support for this definition within the specification. In particular, the specification does not support the construction of this phrase

as an "elastic device," which among other definitions could include a rubber band. *See* THE AMERICAN COLLEGE HERITAGE DICTIONARY at 440 (1997). The adoption of this definition, therefore, would effectively broaden a "torque spring" to devices not originally contemplated by the specification. The Court, instead, finds that one of ordinary skill in the art reading the specification would understand the plain and ordinary meaning of the term "spring" as a "coiled component."

Accordingly, for the foregoing reasons, the Court construes the term "torque spring" as:

***a coiled component that exerts a torque force*.**

14. Claim 14

Claim 14 recites:

> The device according to claim 1 further comprising means for urging the means for prying to its second position whenever the means for prying is released from being locked in its first position.

*a. Means for Urging*

The parties agree that this phrase is a "means plus function" claim. As discussed, in order to properly construe this claim, this Court must: 1) first determine the function of the function claimed; and 2) identify the corresponding structure in the specification. Applied Medical, 448 F.3d at 1332.

The parties substantially agree that the function of this element is "urging the means for prying to its second position." *See* Doc. No. 54 at 15; Doc. No. 57 at 31. Plaintiff asserts that the corresponding structure is coiled spring 38, tongue 40 and shank hole 42. Defendants, that the claim is invalid because no corresponding structure can be found. Doc. No. 57 at 31.

A review of the specification confirms that there is corresponding structure to this function in the specification. As discussed, the specification gives ample examples and disclosure on the mechanism of the "detent" structure, and the action of a torque spring to urge the shank into the "second" or fully opened position when the push pin is depressed while the means for prying is in its "first" or retracted position:

> To unlock the shank, the pin 14 is pushed down until the rod is unseated, as best illustrated in FIG. 7, freeing the shank to pivot on boss 32. Once the shank is unlocked, the torque spring 38 urges it to swing out to its fully opened position if it was retracted, or force can be applied to retract the shank if it was opened.

'137 Patent at 14-21. Thus, the phrase can be construed in the context of the entire claim as the action of the means for prying by the torque spring of the detent system when it is released from its first, or retracted, position.

From this definition, the corresponding structure in the specification for the means for urging, therefore, would be the coiled spring, tongue and tongue hole:

> A coiled spring 38 disposed in an annular space around the push pin gets wound tighter when the shank is retracted and exerts a torque on the shank urging the prier to be in the fully opened position. One end of the torque spring is fixed in place by hooking a tongue 40 extending from the handle front side, and the other end of the spring rotates with the shank because it resides in a hole 42 defined by the shank near its pivot point.

'137 Patent at 3:58-65. Accordingly, the Court construes the phrase "means for urging the means for prying to its second position whenever the means for prying is released from being locked in its first position" as a means plus function claim, where the identified function is

***urging the means for prying to its second position***,

and the corresponding structure as:

***a torque spring, a tongue and a tongue hole***.

**B. Defendants' Motion for Partial Summary Judgment of Invalidity**

Defendants also argue that select claims should be found invalid under 35 U.S.C. § 112, ¶¶ 1, 2 and 6. As this Court found in its earlier Order directing the parties to submit supplemental briefing, any argument regarding invalidity of the claim for lack of enablement or indefiniteness of the claim is "neither appropriate nor acceptable at the claim construction stage." Doc. No. 44 at 2, citing to Intervet America, 887 F.2d at 1053 ("Ambiguity, undue breadth, vagueness, and triviality are matters which go to claim validity for failure to comply with 35 U.S.C. § 112 ¶ 2, not to interpretation or construction."); Harrah's Entertainment, 321 F.Supp.2d at 1176 ("[T]he court must attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness."); ASM America, Inc. v. Genus, Inc., 2002 WL 1892200, *15 (N.D. Cal. Aug. 15, 2002). As noted by the Federal Circuit, a claim can only be found indefinite, for example, "if reasonable efforts at claim construction prove futile." Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005).

Similarly, a claim must be construed first before an enablement inquiry is undertaken. *See* Liquid Dynamics, 449 F.3d at 1224 n.2; AK Steel Corp. v. Sollac and Ugine, 344 F.3d 1234, 1241 (Fed. Cir. 2003) ("Because a patent specification must enable the full scope of a claimed invention, an enablement inquiry typically beings with a construction of the claims."). Accordingly, the Court will determine the invalidity of the claims based on the construction of the terms as above.

1. Claim 1

*a. "A second position at which the handle can used for leverage to pry up the turf"*

Defendants first argue that the dictionary definitions of "second", "use" and "leverage" do not allow for this disputed phrase to be construed under 35 U.S.C. § 112, ¶¶ 2 and 6 because: 1) the handle cannot act as a leverage if leverage means "the action of a lever or the mechanical advantage gained by it", and a lever is:

> a rigid piece that transmits and modifies force or motion when forces are applied at two points and turns about a third; specifically: a rigid bar used to exert a pressure or sustain a weight at one point of its length by the application of a force at a second and turning at a third on a fulcrum.

Doc. No. 56 at 8-9. In addition, Defendants assert that the grammatical error renders the claim ambiguous, which a "district court cannot act to correct". Id. at 9, citing to Novo Industries, 350 F.3d at 1356.

Whether a claim is indefinite is dependent upon the context of the disputed term in light of the knowledge of one of ordinary skill in the art. "Claim definiteness is analyzed 'not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art.'" Energizer Holdings, Inc. v. International Trade Commission, 435 F.3d 1366, 1370 (Fed. Cir. 2006), quoting In re Moore, 439 F.2d 1232, 1235 (C.C.P.A. 1971). Thus, a claim is not indefinite because of a "difficult issue of claim construction." Bancorp Servs. L.L.C. v. Hartford Life Ins. Co., 359 F.3d 1367, 1371 (Fed. Cir. 2004). Instead, a claim is deemed indefinite only it is "insolubly ambiguous." Id. ("[I]f the claim is subject to construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness.").

The parties here dispute whether the grammatical error in the phrase "a second position at which the handle can used for leverage to pry up the turf" renders the claim indefinite. Between the term "can" and "used" should contain the verb "be". Although Defendants are correct that Plaintiff had the opportunity to correct, and did correct, grammatical errors through a certificate of correction process, that Plaintiff failed to correct other grammatical errors does not necessarily render the claim indefinite. Instead, if one of ordinary skill in the art, in light of his or her knowledge and with the benefit of the specification, can interpret the disputed phrase, the claim is not indefinite. *See* Energizer Holdings, 435 F.3d at 1370; *see also* Superior Fireplace Co. v. Majestic Products Co., 270 F.3d 1358, 1373 (Fed. Cir. 2001) (Court can look to the specification to interpret grammatical error in claim). As discussed, the specification and claim language in the instant matter allow one of ordinary skill in the art to interpret the phrase despite the presence of the grammatical error, and understand that the handle "can [be] used for leverage."

In addition, Defendants' argument that the claim is invalid for indefiniteness because of a lack of clarity as to "how the handle is used for leverage" also lacks merit. Here, the specification adequately describes the handle being used as a leverage to pry up the turf. *See* abstract ("the prier is pivotally connected to an end of a handle for leverage"); 2:38-40 ("a second position at which the handle can be used to leverage the prier to pry up the turf."). Accordingly, the claim language does not render the claim "insolubly ambiguous" because the specification guides one of ordinary skill in the art to understand the claim.

This Court, therefore, DENIES Defendants' partial summary judgment of indefiniteness for claim 1.

2. Claim 2

*a. "Means for spacing"*

Defendants argue that the disputed phrase "means for spacing" is indefinite because the specification does not disclose a structure that discloses this function other than the handle, shank, and blade of the means for prying, already claimed in claim 1. Doc. No. 57 at 11. Defendants contend, instead, that claim construction rules require a different structure to be

found for different terms. Id., citing to CAE Screenplates, Inc. v. Heinrich Fiedler GmbH, 224 F.3d 1308, 1317 (Fed. Cir. 2000). Defendants point out that since no other structure in the specification describes a means for spacing, outside of the already claimed handle, shank and blade, the claim is rendered indefinite under 35 U.S.C. § 112, ¶ 2.

In CAE Screenplates, the Federal Circuit looked at whether the term "plane" as used describes a physical structure, or if the term defines directional positioning of the device. The court, noting that words or phrases in the patent should be interpreted consistently, nevertheless stated that "[i]n some cases, a claim term can be given a different meaning in the various claims of the same patent, when a patent so provides." 224 F.3d at 1317. The court therefore, contrary to Defendants' contentions, explicitly found that claim interpretation is dependent upon whether the specification allows either the same, or different meanings to be attached to the same term, or structure. *See also* Schoenhaus v. Genesco, Inc., 440 F.3d 1354, 1358 (Fed. Cir. 2006) ("The patentee is free to act as his own lexicographer, and may set forth any special definitions of the claim terms in the patent specification or file history.").

In addition, the Court notes that Defendants are incorrect in arguing that the disputed claim phrase recites no additional limitations from independent claim 1. Defendants fail to acknowledge that the claimed structure here is modified by the action of being stuck "generally vertically" in the turf. The structure of claim 1, therefore, is modified in claim 2 with the addition of the "fully opened" means for prying being stuck in the turf, and therefore the term adds additional limitations not previously presented in independent claim 1. Defendants' argument regarding claim differentiation, therefore, lacks merit.

Moreover, even if the structures were shared making the claims similar in scope, Defendants are incorrect in arguing that the doctrine of claim differentiation overrides the statutory mandate of section 112, ¶ 6. In IMS Technology, Inc. v. Haas Automation, Inc., 206 F.3d 1422 (Fed. Cir. 2000), the Federal Circuit looked directly at the issue of whether it was permissible for two "means plus function claims" to have similar scope. The Court answered in the affirmative, finding that the doctrine of claim differentiation, a court-made rule, could not override the statutory mandate of ¶ 6. Id. at 1434. "[I]t is permissible for [two claims] to

have similar scope after each is correctly construed in light of the structures contained in the written description, because the judicially-created doctrine of claim differentiation cannot override the statutory mandate of § 112, ¶ 6." Id.

Accordingly, for the reasons stated above, the Court DENIES Defendants' motion for summary judgment of invalidity of the term "means for spacing."

*b.* *"Lockable in position"*

Defendants contend that the phrase "lockable in position" is invalid under 35 U.S.C. § 112, ¶¶ 1 and 2 as indefinite for lack of enablement and for indefiniteness. Doc. No. 57 at 13-15. As discussed, for a claim to be found indefinite, the claim must be "insolubly ambiguous"to one of ordinary skill in the art. Energizer Holdings, 435 F.3d at 1370 ("'If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite.'").

Defendants first argue that because the terms "releasably locking" and "lockable" describe the same detent structure disclosed in the '137 Patent specification, and no additional structure can be identified corresponding to the disputed term, the claim is rendered indefinite. Doc. No. 57 at 14. Although the specification uses the terms "releasably locking" and "lockable" interchangeably in describing the same detent structure, *see* '137 Patent at 2:49-53; 3:40-42; 3:65-67, Defendants are incorrect that the claim is rendered invalid because the specification fails to disclose two separate structures that should be separately defined by the two terms. As discussed, contrary to Defendants' contentions, claim 2 does add the additional limitation of being stuck "generally vertically" in the turf. In addition, the doctrine of claim differentiation cannot trump the statutorily-mandated provisions of 35 U.S.C. § 112, ¶ 6, and therefore different claims may have the same scope or meaning "when a patent so provides." *See* CAE Screenplates, 224 F.3d at 1317. The Court, therefore, finds Defendants' arguments as to indefiniteness unpersuasive.

Second, because this Court has already found that the specification adequately teaches a detent structure as well as how to use the same, the specification does enable one of ordinary skill in the art to make and use the invention. This Court accordingly DENIES Defendants'

partial summary judgment of invalidity for claim 2.

3. Claim 3

Defendants also argue that claim 3 is invalid under 35 U.S.C. § 112, ¶ 1 as not containing enabling disclosure for one of ordinary skill in the art. Doc. No. 57 at 15-16. Defendants specifically object to the phrase "means for cutting a cylindrical plug out of the end of a cigar." Id. Although Defendants state that the disclosure contains corresponding structure for the "means for cutting" element, and that the specification discloses that "[o]ne presses a cigar against the blade and rotates axially, Defendants nonethless contend that "[n]owhere in the specification, though, does [the specification] teach how pressing a cigar against the blade and rotating will cause a cylindrical plug to be cut out of the cigar." Id. (emphasis in original). Plaintiff does not comment on Defendants' argument.

Under 35 U.S.C. § 112, ¶ 1, a patent must describe "the manner and process of making and using [the invention], in such clear and concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use [the invention]." "The enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the invention without undue experimentation." AK Steel, 344 F.3d at 1244.

A review of the specification supports that the specification contains sufficient disclosure to enable one of ordinary skill in the art to make and use the invention claimed. First, the specification gives a fairly detailed description on how to use the cigar cutter feature:

> To use the cigar cutter, the pivot pin 14 is depressed by the user's digit, allowing the torque spring to open the prier. When the prier is retracted into its slot, the prier blocks the cutting blade 22. With the prier out of the way, the tip of a cigar can be pressed onto the cutting blade, causing the blade to cut into the cigar until the tip abuts the base of the annular recess 26. The cigar is then rotated axially and pulled out, leaving a shallow circular plug of tobacco inside the cutting blade which is easily extracted.

'137 Patent at 4:36-45. The specification also provides detailed diagrams in Figures 1, 4 and 5 allowing one of ordinary skill in the art to understand the relationship between the different structures, including the blade 22, recess 26 and opening 28. The specification, therefore, gives sufficient information for one of skill in the art to: 1) place the cigar onto the cutting blade; 2)

press the cigar until the tip of the cigar abuts the recess; 3) rotate the cigar axially and pull out the cigar, which leaves a circular plug of tobacco in the cutting blade.

Accordingly, for the reasons stated above, this Court DENIES Defendants' partial summary judgment of invalidity of claim 3 under 35 U.S.C. § 112, ¶ 1.

4. Claim 4

*a. "Means for spacing being in its second position so that it can be generally vertically inserted into turf"*

Defendants argue that the claim is invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2, because the specification does not disclose two separate structures for: 1) a means for prying; and 2) a means for spacing. Defendants reiterate their argument that the doctrine of claim differentiation determines that each claim must have a different scope. As discussed, however, the Federal Circuit in IMS Technology explicitly found that the doctrine of claim differentiation cannot "override the statutory mandate of § 112, ¶ 6." 206 F.3d at 1432. Instead, contrary to Defendants' contentions, it is acceptable to find two claims of similar scope if a court properly construes a claim "in light of the structures disclosed in the specification." Id.

In addition, contrary to Defendants' arguments that claims 1 and 4 claim identical structures, claim 4 adds the additional limitation that the means for prying is limited to its second position so that it can be "generally vertically inserted into turf." *See* '137 Patent at 5:31-31. The claim, therefore, is not rendered insolubly ambiguous. Accordingly, this Court DENIES Defendants' partial summary judgment of invalidity for claim 4.

*b. "Cradle means"*

Defendants assert that claim 4 is invalid because the patent specification does not disclose a corresponding structure for cradle means. However, as discussed, the specification adequately describes the cradle means as a concave recess that supports a golf club grip. *See* '137 Patent at 2:60-61; 4:46-68. Accordingly, this Court DENIES Defendants' partial summary judgment of invalidity for claim 4.

5. Claim 7

*a. "Depression intersects the opening"*

Defendants argue that the phrase "depression intersects the opening" is invalid under 35 U.S.C. § 112, ¶ 2 as indefinite for: 1) having no antecedent basis for "the opening", and 2) for not being clear as to which opening this phrase refers to.

First, Defendants' argument regarding the alleged lack of antecedent basis is not persuasive in light of prevailing Federal Circuit precedence. For example, in Energizer Holdings, the court noted that the failure to provide an antecedent basis in a claim does not automatically render a claim invalid. 435 F.3d at 1370. Instead, the court found that "'[i]f the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite.'" Id. at 1370-1371, quoting Bose Corp. v. JBL, Inc., 274 F.3d 1354, 1359 (Fed. Cir. 2001). The court also held that, contrary to Defendants' contentions, "an antecedent basis can be present by implication." Id. at 1371.

In addition, the remainder of the phrase gives guidance as to the location of the opening as "defined by the handle for the means for prying," and makes clear as to which opening the phrase refers to. The specification also gives additional disclosure on an opening defined by the handle for the means for prying:

> The cutting edge of the blade faces a through-hole 28, congruent with recess 26 defined in the handle's front side 18. The hole 28 and recess 26 are sized in girth to allow an end of a cigar to pass through to be cut by the cutting blade 22.

'137 Patent at 4:32-36. From the context in which the disputed element appears, therefore, one of ordinary skill in the art can discern "the opening" as having basis in the "through-hole" of the means for spacing described in the specification. The claim language, therefore, read in light of the specification and context of the entire claim is not "insolubly ambiguous," and therefore not invalid under 35 U.S.C. § 112, ¶ 2. Accordingly, this Court DENIES Defendants' invalidity claim.

*b. "Which blocks access to the cutting blade"*

Defendants argue that the phrase is invalid under 35 U.S.C. § 112, ¶ 2 as indefinite for being allegedly unclear as to what structure blocks access to the cutting blade. Doc. No. 60 at 16. Defendants also contend that one of ordinary skill in the art cannot determine from the claim language what opening is being referred to. Id.

As discussed, for a claim to be found indefinite, the claim must be "insolubly ambiguous" to one of ordinary skill in the art upon reading the specification and accompanying disclosure. Energizer Holdings, 435 F.3d at 1370 ("'If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite.'"). As discussed, the plain and ordinary meaning of the claim and the specification, as well as the knowledge of one of ordinary skill in the art, allows the construction of this claim to identify what structure blocks access to the cutting blade, and what opening is being referred to. *See* section II.A.7. The disputed phrase, therefore, is not insolubly ambiguous to one of ordinary skill in the art. Accordingly, the Court DENIES Defendants' summary judgment of invalidity for claim 7.

6. Claim 8

*a. "An opening defined by the handle"*

Defendants argue that the phrase "an opening defined by the handle" is invalid under 35 U.S.C. § 112, ¶ 2 as indefinite for not being clear as to which opening this phrase refers to.

As discussed, for a claim to be indefinite, the claim must be found "insolubly ambiguous" to one of ordinary skill in the art. Energizer Holdings, 435 F.3d at 1370. "The definiteness inquiry 'focuses on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the rest of the specification.'" Id. Claims are not held indefinite because claim construction proves a difficult task. Id. "[I]f the meaning of the claim is discernible, even thought the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." Id., quoting Exxon Research, 265 F.3d at 1375.

In the instant matter, although claim construction may have been difficult because of the typographical error present in the claim, the Court finds that the claim language here does not preclude one of ordinary skill in the art from discerning the boundaries and scope of the claim. The specification, as well the language and context of the entire claim, makes clear that the means for prying is disposed in a slot 12, or opening, when the means for prying is in its first, or retracted, position:

> The prier can pivot between a retracted position, in which it is fully inside a slot 12 defined by the handle, and a fully opened position in which it is out of the slot

and locked in alignment with the handle.

'137 Patent at 3:27-30; *see also* Figs. 1-3 and claim 1. From the plain and ordinary meaning of the claim, as well as from the specification, one of ordinary skill in the art could readily discern the scope and meaning of the claim. Accordingly, the Court DENIES Defendants' summary judgment motion for invalidity of claim 8.

7. Claim 10

a. *"Whenever the means for prying is released from being locked in its first position"*

Defendants argue that the disputed phrase is invalid under 35 U.S.C. § 112, ¶ 2 as indefinite for not being clear as to the means for urging element. Defendants state that "[d]ue to the conditional nature of the element, it is unclear if the means for urging is simply non-existent when the precipitating event (release) does not occur." Doc. No. 60 at 21. Defendants explain that the lack of a verb connotes that the "means for urging suddenly comes into existence when the prying means is released." Doc. No. 57 at 25.

As discussed, for a claim to be indefinite, the claim must be found "insolubly ambiguous" to one of ordinary skill in the art. Energizer Holdings, 435 F.3d at 1370. "'If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite.'" Id. at 1370-1371, quoting Bose, 274 F.3d at 1359. In the instant matter, one of ordinary skill in the art would not find the claim language "insolubly ambiguous" upon reading the entire context of the claim, as well as the specification and accompanying disclosures. As the Court has already found, the claim can be understood by one of ordinary skill in the art, and construed this disputed phrase to mean "when the means for prying is released from its retracted position." *See* section II.A.10. Any alleged lack of a verb, therefore, does not render this claim insolubly ambiguous because one of ordinary skill in the art can reasonably ascertain the scope of the claim. The claim, therefore, cannot be indefinite under 35 U.S.C. § 112, ¶ 2.

In addition, Defendants' argument that one of ordinary skill in the art would understand the claim to mean that the "means for urging suddenly comes into existence when the prying means is released" is not persuasive. As discussed, the claims are read from the viewpoint of one

of ordinary skill in the art reading the specification. One of ordinary skill in the art, looking at the context of the claim language as well as the specification, would understand instead that the claim language here refers to the action of the means for urging the means for prying into its second position "when the means for prying is released from its retracted position." As explained, Defendants cannot use definitions from extrinsic evidence to come to an alternative conclusion that does not comport with claim language and specification.

Accordingly, this Court DENIES Defendants' partial summary judgment for invalidity of claim 10.

8. Claim 11

a. *"A detent for locking the means for prying in either of its two operable positions when the detent is engaged"*

Defendants argue that the claim is not enabled because the specification does not provide a corresponding structure in the specification. As discussed, because the specification adequately teaches a detent structure, as well as how to use the detent structure, the specification does enable one of ordinary skill in the art to make and use the invention. The Court, therefore DENIES Defendants' partial summary judgment motion of claim 11 for the disputed phrase.

b. *"Means for disengaging"*

Defendants also argue that the claim is not enabled because the specification does not provide a corresponding structure in the specification for the "means for disengaging." As discussed, because the specification adequately teaches a "means for disengaging" structure as a push pin, the specification does enable one of ordinary skill in the art to make and use the invention. The Court, therefore, DENIES Defendants' partial motion for summary judgment for invalidity of claim 11.

9. Claim 12

a. *"Means for biasing the pin to reside at one extent of its range"*

Defendants argue that because no embodiment is disclosed in the patent specification for the element "means for biasing," claim 12 is invalid for indefiniteness under 35 U.S.C. §

112, ¶ 2. Doc. No. 57 at 29. As discussed, this Court found corresponding structure in the specification for the means for biasing as a "compression spring." *See supra*, II.A.12. The specification, therefore, is not insolubly ambiguous because the claim language has meaning that is discernable to one of ordinary skill in the art. Union Pac., 236 F.3d at 692. Accordingly, the Court DENIES Defendants' partial motion for summary judgment for invalidity of claim 12.

10. Claim 14

*a. "Means for urging"*

Defendants reiterate their argument for claim 10 that the element "means for urging" is indefinite under 35 U.S.C. § 112, ¶ 2, because the lack of a verb renders the claim non-sensical. Doc. No. 57 at 31. As discussed, the claim language is not rendered insolubly ambiguous such that one of ordinary skill in the art cannot discern the meaning of the claim. On the contrary, this Court construed the claim according to its plain and ordinary meaning, as well as in light of the specification. The Court, therefore, DENIES Defendants' partial summary judgment motion for invalidity of claim 14.

## CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

I. The disputed terms are **CONSTRUED** as follows:

1. "Means ... for prying up" is construed as a means plus function claim under 36 U.S.C. § 112, ¶ 6, where the function is "*to pry up a ball mark in turf*" and the corresponding structure in the specification is "*a shank terminating in a pair of tines, a blade or a shovel-like head*."
2. "Two operable positions" is construed as "*the two positions of the prying means when it is open to expose the prying means, and when it is retracted into the handle.*"
3. "Retracted into" is construed as "*to pivot back.*"
4. "Handle can [sic] used for leverage to pry up the turf" as "*handle of the prying means is used as leverage to pry up the turf.*"
5. "Means for releasably locking" is construed as a means plus function claim under

36 U.S.C. § 112, ¶ 6, where the function is "*to releasably lock the means for prying at both positions*" and the corresponding structure is "*a detent mechanism consisting of a rod, rod seat and push pin*."

6. "The device according to" is construed as "*the device incorporating the elements of the claim depended therefrom*."

7. "Further comprising" is construed as "*the dependent claim includes additional limitations.*"

8. "Means for spacing" is construed as a means plus function claim under 36 U.S.C. § 112, ¶ 6, where the function is "*to space a grip end of a golf club from the turf beneath*," and the corresponding structure is "*the means for prying in a fully opened position and stuck generally vertically in the turf, wherein the handle of the means for prying contains a concave recess or cradle.*"

9. "Said means for spacing being lockable in position" is construed as "*the means for spacing being lockable when the means for prying is in its fully opened position*."

10. "Means for cutting" is construed as a means plus function claim under 36 U.S.C. § 112, ¶ 6, where the function is "*to cut a cylindrical plug from the end of a cigar*," and the corresponding structure construed as: "*a circular blade.*"

11. "Means for prying being in its second position" is construed as "*the means for prying being in its second, or fully opened, position*."

12. "Cradle means" is construed as a means plus function claim under 36 U.S.C. § 112, ¶ 6, where the function is "*to vertically support the shaft of a leaning club*," and the corresponding structure is a "*concave recess generally centered in the end of the handle.*"

13. "A depression defined by the handle," is construed as "*a physical recess within the handle of the device*."

14. "Sized in girth for an end of a cigar" is construed as "*the depression being sized to allow the reception of the end of a cigar*."

15. "Base of the depression" is construed as "*the base of the physical recess*."

16. "A circular cutting blade affixed to the handle at the base of the depression" is construed as "*a circular blade for cutting attached to the base of the depression*."

17. "Depression intersects the opening" is construed as "*a depression that meets in the opening defined by the handle for the means for prying*."

18. "Which blocks access to the cutting blade" is construed as "*the means for prying blocking access to the cutting blade when the means for prying is in the opening*."

19. "An opening defined by the handle" is construed as "*an opening of the means for prying which is defined by the handle*."

20. "Means for prying is disposed when in its first position" is construed as "*means for prying when it is retracted into the handle*."

21. "A shank" is construed as "*a connective structure of the means for prying*."

22. "Plurality of tines projecting therefrom" is construed as "*at least two slender projections projecting from the means for prying*."

23. "Whenever the means for prying is released from being locked in its first position," is construed as "*when the means for prying is released from its retracted position*."

24. "A detent for locking the means for prying in either of its two operable positions when the detent is engaged" is construed as "*a mechanism for positioning and holding the means for prying in either of its two operable positions when it is interlocked or meshed with the means for prying*."

25. "Means for disengaging" is construed as a means plus function claim under 36 U.S.C. § 112, ¶ 6, where the function is "*for disengaging the detent in response to force applied by a user's finger or thumb*," and the corresponding structure as a "*push pin*."

26. "Means for biasing" is construed as a means plus function claim under 35 U.S.C. § 112, ¶ 6, where the function is "means for biasing" is "*biasing the pin to reside at one extent of its range*," and the corresponding structure is "*a compression spring*."

27. "Engaged Whenever the Pin is at Said One Extent of its Range" is construed as "*the detent operating when the pin is biased to one extent of its range and the means for*

*prying is in one of its two operable positions.”*

28. “Torque spring” is construed as “*a coiled component that exerts a torque force*.”

29. “Means for urging” is construed as a means plus function claim under 36 U.S.C. § 112, ¶ 6, where the function is “*urging the means for prying to its second position,*” and the corresponding structure is “*a torque spring, a tongue and a tongue hole*.”

II. Defendants’ partial motion for summary judgment [Doc. No. 56] is **DENIED** in its entirety.

**IT IS SO ORDERED**.

DATED: February 13, 2007

HON. JOHN A. HOUSTON
United States District Judge

cc: Magistrate Judge Bencivengo
All Counsel of Record