UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DIVIX GOLF INC.<br><br>Plaintiff,<br>v.<br><br>JEFFREY P. MOHR<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 05CV1488 JAH (CAB)<br><br>[AMENDED] FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER |

I. INTRODUCTION

Plaintiff filed the Complaint herein on July 26, 2005 alleging six claims against defendants/counter-claimants Remedy Golf, Inc. ("Remedy"), Jeffrey P. Mohr ("Mohr"), Bandwagon, Inc. ("Bandwagon"), Felix Hoang ("Hoang") and Diana Sarcoz ("Sarcoz"). The first count alleges literal patent infringement and inducement to infringe against Remedy, Mohr, and Bandwagon of all the claims of United States Letters Patent No. 6,162,137 issued to individuals TODD JONES and GREG BARK for a folding divot repair tool that opens and closes like a switchblade. Plaintiff's third claim alleges trademark and trade dress infringement for, among other wrongful acts, mislabeling Remedy's divot repair tools as "Divix" and using trade dress confusingly similar to that used by Plaintiff to deceive the public into thinking that Divix was a Remedy brand. On March 28, 2009 the Court granted summary judgment for defendant on the remaining four claims.

Among other affirmative defenses, all defendants herein have alleged in their Ninth Affirmative Defense that the subject patent is unenforceable due to inequitable conduct

during the prosecution of the asserted patent. Among other counterclaims, all defendants herein are seeking in their Second Counterclaim for Relief a declaratory judgment that the subject patent is unenforceable.

On August 10, 2009, the Court ordered that the trial in this matter be bifurcated such that the issue raised in defendants' Ninth Affirmative Defense and Second Counterclaim for Relief, inequitable conduct during the prosecution of the subject patent, be tried first and that following the Court's decision on this issue, a date will be set for trying the balance of the issues in this case.

The trial of defendants' Ninth Affirmative Defense and Second Counterclaim for Relief commenced 9:00 am on September 9, 2009 and concluded on September 17, 2009.

## II. ISSUES TRIED

The overall issue tried in this first installment of the bifurcation was defendants' claim of inequitable conduct against the named inventors of U.S. Patent 6,162,137 ('137 patent), Todd Jones and Greg Bark, and their patent prosecution attorneys, Thomas J. Tighe and Howard C. Tarr. Defendants asserted that the inventors and their attorneys [hereinafter "Inventors"] deliberately deceived the U.S. Patent and Trademark Office ("PTO") by intentionally withholding two pieces of material information during the prosecution of the subject patent in breach of their duty of disclosure as set forth in Title 37 of the Code of Federal Regulations ("CFR") § 1.56.

One instance concerns a product line of small switchblade knives called a Mini Knife made by GT Knives, a company owned and operated by Todd Jones and Greg Bark concurrent with the prosecution of the subject patent. Defendants asserted the switchblade mechanism of the Mini Knife was identical to the mechanism used in the Divix prototype and created before the Divix. Consequently, defendants contend the Mini Knife mechanism was material prior art that should have been disclosed to the PTO. GT Knives also manufactured a product line of switchblade knives larger than the Mini Knife, (hereinafter "Large Knife") concurrent with the prosecution of the subject patent.

The mechanism in the Large Knife contained similar components as the Divix and allowed the Large Knife to operate in a near-identical manner as the Divix. Accordingly, defendants assert the mechanism of the Large Knife, created several years before the Divix, was material prior art that should have been disclosed to the PTO. Finally, defendants contend a switchblade divot repair tool called "Zivot" made by Turnamics, Inc ("Turnamics"), of North Carolina is material prior art the Inventors knew about during the prosecution of '137 Patent and failed to disclose.

In each instance the alleged inequitable conduct was based on omission rather than misrepresentation.

## III. FINDINGS OF FACT

1. This Court has jurisdiction over the parties and the subject matter of this action.
2. Plaintiff Divix Golf, Inc. ("Divix") is represented by Thomas J. Tighe & Associates ("Tighe & Associates").
3. Tighe & Associates also represented Todd Jones and Greg Bark, the founders of Divix in the prosecution of the patent application ("Application") that resulted in the issuing of the '137 patent, the Patent in suit.
4. In or about 1992, Jones and Bark began manufacturing tactical knives and formed a company called GT Knives ("GT").
5. Divix is a spin off corporation of GT and Jones is the President and CEO.
6. GT produced some automatic and manually operated folding knives that utilized a detent mechanism to lock the blade of the knife in both the open and closed positions.
7. The detent mechanism utilized by GT's knives consisted of a push pin, a compression spring, a key, and a biscuit.
8. The automatic knives are different from the manual knives produced by GT in that they contain a torque spring that urges the blade from its closed position to its open position when the detent mechanism is released by pressure from the user's thumb.

9. In or about May of 1998, Jones came up with the idea to make a switchblade style folding divot/ball mark repair tool (" prototype divot tool").

10. Mr. Jones is an experienced machinist and machined the parts for the prototype divot tool in less than a day.

11. Jones utilized a previously made detent mechanism in the prototype divot tool.

12. The prototype divot tool used the same detent mechanism as GT's Mini knife ("Mini"), a project developed concurrently with the idea of the Divot Tool.

13. The detent mechanisms utilized by the prototype divot tool and the Mini consisted of a push pin, a compression spring, a biscuit, and a key.

14. The detent mechanisms utilized allowed the prototype divot tool and the Mini to lock in both their open and closed positions.

15. The divot tool described in the subject patent (the Divix) contained a modified version of the mechanism used by the Mini and prototype divot tool.

16. At the request of defense counsel during trial, Jones took the detent mechanism and blade from the Mini and assembled it with the handle and torque spring from the prototype divot tool and, in effect, created a switchblade out of the prototype divot tool, demonstrating the interchangeability of the detent mechanism and similarity of the designs between the prototype divot tool and the Mini.

17. Each detent mechanism utilized by GT in the production of their knives and the divot tools allowed its respective tool to lock in both the open and closed positions.

18. On or about September 29, 2008, Jones met with Attorney Howard Tarr, an associate attorney at Tighe & Associates, to discuss obtaining a patent for the divot tool.

19. At that meeting Jones informed Tarr that the divot tool utilized the same detent mechanism as the Mini.

20. Tarr knew that Jones owned GT and GT manufactured knives.

21. On or about April 9, 1999, Tighe sent a letter to Jones confirming a telephone conversation in which Tarr advised Jones the Application for the subject patent was

ready for review.

22. The detent mechanism claimed in the Application and identified in the preferred embodiment or specifications of the Application contained two modifications of the previous detent mechanisms used in the prototype divot tool and GT's knives: a rod replaced the key in the previous detent mechanism and a boss and flange replaced the biscuit.

23. The detent mechanism claimed and identified in the Application performed the same basic function as the detent mechanisms utilized by the prototype divot tool and GT's knives in that each detent mechanism allowed its respective tool to lock in both its open and closed position. The Introduction section of the Application stated the claimed divot tool operated similar to a switchblade knife.

24. Prior to filing the Application Jones searched trade magazines and visited retail golf shops to look at other switchblade style divot tools and did not find any device which matched that description. Defendant Mohr searched for switchblade style divot tools around the time the Inventors filed the Application and did not find any besides the Divix. Jones and Bark ultimately named and marketed the Divot Tool with the mechanism described in the Application as the "Divix."

25. On or about May 5, 1999 Jones and Bark signed a Combined Declaration/Power of Attorney to state they reviewed the Application and acknowledged their duty to disclose material information to the Patent and Trademark Office ("PTO") in accordance with 37 CFR §1.56 (a).

26. On or about June 4, 2000, Tarr sent both Jones and Bark a letter to inform them the PTO received their Application. That letter also advised Jones and Bark about the duty of disclosure.

27. On or about August 23, 1999, Tarr sent Jones and Bark another letter to inform them an Information Disclosure Statement ("IDS") should be filed with the PTO that discloses all known material information.

28. Jones and Bark did not disclose the GT knife mechanism to the PTO because they

did not intend to patent the detent mechanism.

29. Claims 11 and 12 of the '137 Patent identify a detent mechanism and the Description of The Preferred Embodiment describes the detent mechanism as having a push pin compression spring, a boss and flange and a rod.

30. Jones and Bark were under the belief that the duty of disclosure only required them to disclose information and prior art concerning other switchblade style divot tools. When they filed the Application Jones and Bark did not believe any such information existed.

31. Tarr admitted the information regarding GT's knives should have been disclosed to the PTO if the knives qualified as prior art.

32. Tarr stated that the Inventors did not disclose the GT knife detent to the patent office even though it operates in an identical manner as the Divix detent listed in the '137 patent claims because the detent referred to in the claims is a detent in the "generic" sense.

33. In or about January 2000, while the Application was still pending, Jones and Bark became aware of another switchblade style divot tool known as the "Zivot" at the PGA annual golf show.

34. The Zivot is a switchblade divot repair tool that utilizes a detent and operates like a switchblade with the ability to lock in both its open and closed positions.

35. The Zivot is manufactured by Turnamics, Inc. located in North Carolina. The Zivot trademark application lists the Zivot's first use in commerce as January 25, 1999.

36. Jones could not recall whether he informed his patent attorneys about the Zivot tool and testified he did not know the duty of disclosure to the PTO continued after he filed the Application. Jones and Bark both testified they immediately believed the Zivot infringed on their patent.

37. On or about April 24, 2000, Tarr sent Jones and Bark a letter to inform them the PTO rejected claims 1 and 5-11 of the Application as anticipated by United States

Patent No. 5,405,133 ("Upton").

38. Upton disclosed a folding divot repair tool that operated with a push button detent mechanism, like a switchblade, and locked only in the closed position.

39. In his April 14, 2000 letter, Tarr informed Jones and Bark they could overcome the Examiner's rejection through an amendment to the application that pointed out differences between Upton and the Divix.

40. On or about April 24, 2000, Tarr met with Jones to discuss the differences between Upton and the Divix.

41. On or about July 6, 2000, Tarr filed an amendment to the Application with the PTO that stated the Divix differed from Upton because its push button pivoted around the push pin and enabled the divot prier to lock in both the open and closed position whereas the divot prier in Upton only locked in the closed position.

42. On or about July 26, 2000 the Examiner notified Tarr of another divot repair tool that locked in both the opened and closed positions, United States Patent No. 5,449,169 ("Hardin")

43. Hardin locked in both its open and closed positions but operated through a slide button mechanism, rather than a push button detent, and did not pivot like a switchblade between the open and closed positions.

44. The Examiner informed Tarr that Hardin read on Claim 1 but that she would allow Claim 1 if the limitations of Claim 5 were added to Claim 1 such that Claim 1 read the "means for prying is pivotable between the two operable positions" instead of the "means for prying is movable between the two operable positions," and for clarification, line 7 in Claim 1, which states "means for releasably locking the means for prying at either position" was replaced with "means for releasably locking the means for prying at both positions."

45. Tighe testified that the Zivot read on Claim 1 of the '137 Patent.

46. Jones stated he did not disclose the Zivot when he amended the Application, because the amendment occurred four months after the PGA show when he no

longer remembered the Zivot.

47. In September 2000, two months after the Application amendment, defendant Jeffrey Mohr, while meeting with Jones in Jones' office and asking Jones about the Zivot, observed Jones pull a Zivot from his desk drawer.

48. The '137 patent ultimately issued in December 2000 based on the amendments to the Application made by Tarr.

## IV. CONCLUSIONS OF LAW

To prove that a patent is unenforceable due to inequitable conduct, the defendants must provide clear and convincing evidence of (1) affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information and (2) an intent to deceive." (Impax Labs, Inc. v. Aventis Pharm Inc., 468 F.3d 1366, 1374 (Fed. Cir. 2006).

Information is material if either a reasonable examiner would have considered it important to the patentability of a claim, J.P. Stevens & Co. v. Lex Tex Ltd, 747 F.2d 1553, 1559 (Fed. Cir. 1984), or "when it is not cumulative to information already of record or being made of record in the application, and (1) It establishes, by itself or in combination, a prima facie case of unpatentability of a claim, or (2) It refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability." 37 C.F.R. 1.56. "Where an applicant fails to disclose an otherwise material prior art reference, that failure will not support a finding of inequitable conduct if the reference is "simply cumulative to other references," i.e., if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1582 (Fed. Cir. 1991). However, "[a] withheld reference may be highly material and not cumulative when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references." Semiconductor Energy Laboratory Co. v.

Samsung Electronics Co., 204 F.3d 1368, 1374 (Fed. Cir. 2000). Moreover, a misstatement or omission may be material even if disclosure of that misstatement or omission would not have rendered the invention unpatentable." Cargill Inc. v. Canbra Foods, Ltd., 476 F.3d 1359 (Fed. Cir. 2007)(citing Digital Control, 437 F.3d at 1318).[1] During trial defendants claimed the Inventors failed to disclose two pieces of material information to the Patent office, GT's Knives and the Zivot . The Court will discuss each of these in turn.

A. GT Knives

Upon the patent examiner's initial review of the Application, she determined that Upton anticipated Claims 1 and 5-11. Claim 1 described the Divix device as a divot repair tool with a divot prier that moved between the open and closed position, locked in either position, and retracted into a handle. Claims 5-11 described the push button detent that allowed the divot prier to operate in the aforementioned manner. After the Inventors filed a traverse that distinguished the Divix from Upton based on the Divix' ability to lock in both the open and closed position, the patent examiner determined that Claim 1 was anticipated by Hardin because Hardin also locked in the open and closed position. However, the patent examiner informed the inventors that claim 1 would be acceptable if the Inventors changed the language of Claim 1 such that it read "the means for prying being pivotable between two operable positions" rather than "the means for prying being movable between two operable positions" and substituted "the means for releasably locking the means for prying at both positions," in place of "the means for releasably locking the means for prying at either position."

According to the defendants, the Divix detent mechanism allows its means for prying, or divot prier, to pivot between the open and closed position and lock in the open

[1]The reasonable examiner standard merely provides an additional test of materiality. That is, if a misstatement or omission is material under the new Rule 56 standard, it is material. Similarly, if a misstatement or omission is material under the "reasonable examiner" standard or under the older three tests, it is also material. To the extent that one standard requires a higher showing of materiality than another standard, the requisite finding of intent may be lower. Digital Control, Inc. v. Charles Machine Works, 437 F.3d 1309, 1316 (Fed Cir. 2006).

and closed position. Defendants assert the combination of those two factors made the Divix unique, and thus patentable, over the Upton and Hardin patents. Defendants assert the mechanism in GT's switchblade knives, manufactured several years before the Divix, allows the knife blade to pivot between the open and closed position and lock in both the open and closed positions. Because the knife mechanism contains the exact features that made the Divix patentable, defendants contend the knife is material information that should have been disclosed to the patent office.

Defendants also assert the GT knives, in combination with the claims in the Upton and Hardin patents, would have made the Divix obvious to one skilled in the art. As obviousness establishes a prima facie case of unpatentability, defendant contends the GT knives must be material under the standard set forth in Rule 1.56. Finally defendants contend the GT knives were not cumulative because the knife mechanism combined the novel features of both the Upton and Hardin patents and thus offered a more complete combination of relevant features than Upton or Hardin.

According to plaintiff, because defendant presented no expert testimony on the "reasonable examiner" standard, the most probative evidence is what the patent examiner actually deemed material when she examined the Inventors' application. Although the patent examiner originally rejected Claims 1 and 5-11 as anticipated by Upton, the examiner ultimately accepted the Inventors amended Application without any changes to the claims that described the Divix mechanism. Plaintiff argues this demonstrates the examiner construed the detent in a generic sense, rather than as a specific type of detent unique to the Application.

Plaintiff further states the detent mechanism in the Divix consists of various components: a push button, compression spring, rod, boss and flange, tortion spring, and tortion spring recess. According to plaintiff, the parts of the mechanism included in the '137 patent claims, specifically the push button and compression spring, tortion spring and tortion spring recess, were already disclosed by Upton and Hardin. The remaining parts of the mechanism were not included in the Claims, although they were specified in the

preferred embodiment. Plaintiff contends any prior art, including the knife mechanism, that disclosed unclaimed parts of the mechanism are not material. Plaintiff also states that because the key and biscuit combination of the GT knife is different from the rod and boss/flange combination found in the Divix, those components of the knife mechanism are not material, even though the combinations perform similar functions.

Defendants counter this argument by asserting the examiner did not construe the detent in the '137 claims as generic, but rather as a novel feature that made the Divix patentable because it allowed the push button to pivot around the compression spring and lock in both the open and closed position. Plaintiff argues the ability of the GT knives to lock when open and closed was cumulative information because the patentees disclosed that the Divix operated "similar to switch-blade knife," and it is common knowledge that switchblades lock when open and closed. According to plaintiff, the GT Knives were also cumulative because the patent examiner already knew about Hardin, a divot tool that locked in the open and closed position.

This Court finds that in light of the reference in the Application that the Divix operates similar to a switchblade knife, as well as the Upton and Hardin patents, a reasonable examiner would not have deemed the GT switchblade knives material, noncumulative information. This Court agrees with plaintiff that a reasonable examiner would consider GT's switchblade knives cumulative in this instance. This Court finds the examiner ultimately issued the '137 patent because the Divix contained a means for prying that both pivots between the open and closed position and locks in the open and closed position, unlike previous divot repair tools.

Claim 1 in both the Application and '137 patent describe a "device for repairing a ball mark in turf comprising . . . a handle, . . . means, connected to the handle, for prying up a ball mark in turf, . . . [and] means for releasably locking the means for prying. Claims 5-8 in the Application and 10-13 in the '137 patent generically describe some of the mechanism components that allow the Divix to function. Despite the defendants repeated assertion to the contrary, the Court finds that the knife and Divix mechanisms were not

the same because the Divix mechanism contained a rod, boss and flange that allowed the Divix to function well in dirt, an essential feature of a divot tool. While the knife mechanism closely resembled the Divix mechanism, it contained a key and biscuit instead of a rod, boss & flange and thus could not function as effectively in dirt.

Notwithstanding the apparent importance of the rod, boss and flange to the effectiveness of the Divix mechanism, the Inventors did not include any of those components in the '137 patent claims. While the components are listed in the preferred embodiment, "that is not a substitute for, nor can it be used to rewrite, the chosen claim language." Thus, while "understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim." Superguide Corp. v. DirecTV Enterprises, Inc., 358 F.3d 870, 875(Fed. Cir. 2004).

This Court concludes that based on the decision by the Inventors not to claim the mechanism components that enable the Divix to function effectively as a divot repair tool, namely the rod, boss and flange, the Inventors did not intend to patent the mechanism itself. Rather, the Inventors intended to patent a divot repair tool that operates like a switchblade. This Court further finds that based on the patent examiner's initial rejection of the Application, it is clear the examiner was aware of the switch blade related mechanism of the Divix and went on to focus upon and reject the switchblade related claims as anticipated by Upton. The Court also finds that based on the examiner's decision to allow an unmodified version of the claims that describe the Divix mechanism, and despite her previous rejection of those same claims as anticipated by Upton, the examiner focused on the switchblade function of the tool, rather than the underlying mechanism, during her evaluation of the device's patentability. In that the Inventors disclosed in the Application that their device operated like a switchblade knife, disclosure of the GT knives would have been cumulative. Moreover, because a reasonable examiner would not have focused on the specific nature of the Divix mechanism during an evaluation of the Divix' patentability, any similarities between the GT knife mechanism

and Divix mechanism would not have been material to the Application. As such, there was no duty for further disclosure of the underlying switchblade related mechanism in GT's knives.[2]

B. The Zivot

During trial, plaintiff's attorney Thomas Tighe admitted that the Zivot read on Claim 1 of the '137 patent. Based on the fact that Inventors Jones and Bark knew about the Zivot in January 2000, eleven months before the issuance of the '137 patent, defendants contend the Zivot is material information that should have been disclosed to the PTO. Plaintiff contends the Zivot is only material information if it qualifies as prior art. According to the Zivot trademark application, the earliest date of Zivot use in commerce was January 1999, seven months after plaintiff filed its patent application. Under 35 U.S.C §102, because the Zivot did not precede the invention of the Divix, it does not qualify as prior art. The Zivot does not meet the definition of prior art as it was neither publicized, sold nor known to the Inventors or others in the field before the Inventors filed the Application.

Rule 1.56 imposes a continuous duty of disclosure on applicants until a patent is issued or claims have been abandoned. The duty of disclosure applies to all material information, not just prior art. It is undisputed that Inventors Jones and Bark became aware of the Zivot tool prior to receiving the '137 patent. Upon observing the Zivot in January 2000, Jones and Bark immediately believed that device infringed on their patent. The examiner did not have any information regarding the existence of another switchblade style divot tool that locked in the open and closed position during her evaluation of the Application. Thus, regardless of whether Jones knew his duty to disclose continued after filing of the application or the Zivot meets the definition of prior art, the information by

---

[2]Defendants' also assent that the GT Knives were material, noncumulative information because the knives, in combination with Upton and Hardin, made the Divix obvious. This Court notes that this portion of the trial concerned only inequitable conduct and not any other affirmative defense. As a result neither party presented any direct evidence on the Divix' obviousness during trial. As such the Court will not address obviousness at this time. Even if GT Knives mechanism would have been material and should have been disclosed, this court finds that defendants failed to present clear and convincing evidence that the Inventors failed to disclose the knive with the intent to mislead the patent office.

Plaintiff was material, noncumulative information that should have been disclosed to the patent office.

C. Intent To Deceive

The failure to disclose material information by itself will not support a finding of inequitable conduct. The defendants must also prove by clear and convincing evidence that the Plaintiffs intended to deceive the Patent Office. Impax Labs, Inc., 468 F3d at 1374. Based upon the findings and conclusion above, this Court finds that even if the information concerning the GT Knives was material and should have been disclosed, the evidence does not support a finding that Plaintiffs intended to deceive the Patent Office. While this Court has found that Defendants have proven that the information concerning the Zivot should have been disclosed by Plaintiffs, there has been no proof by clear and convincing evidence that Plaintiffs intended to deceive. Although defendants claim the Zivot is so material that an intent to deceive can be inferred by the mere failure to disclose the device, the Court does not agree that the weight of any such inferences satisfies Defendant's burden.

V. CONCLUSION

Based on the foregoing, the Court denies Defendant's motion to dismiss for Inequitable Conduct.

IT IS SO ORDERED.

DATED: January 6, 2010

JOHN A. HOUSTON
United States District Judge